REGINA MUSIC BOX COMPANY

*v.*

F. G. OTTO & SONS et al.

[Filed December 22d, 1903.]

1. A mortgage given by a corporation which is insolvent, or which is contemplating insolvency, to secure money lent at the time it is given, is valid under section 64 of the Corporation act of 1896, if the mortgagee be without notice of such insolvency or without notice that it is in contemplation.

2. Contemplation of insolvency, within the meaning of section 64, is something more than contemplation of the possibility of insolvency on a contingency which does not in fact happen. If a corporation, or its officers, regard a suspension of its ordinary business, for want of funds, as likely to happen in the event of its not being able to borrow money with which to meet its current engagements, and it is in fact able to borrow it, and it secures the money lent by a mortgage and goes on, it cannot be said to contemplate insolvency, within the meaning of section 64, at the time the mortgage is executed, for then it contemplates not insolvency, but the reverse.

3. If the notes of a corporation go to protest, that may be *prima facie* evidence of insolvency, but it is not conclusive evidence of it.

4. If a corporation mortgage to trustees to secure an antecedent indebtedness, pursuant to an agreement made with a creditor to whom such mortgage is to be given, and the mortgage, by its terms, is made to cover property then owned and afterward to be acquired, and contains a power authorizing trustees to sell on default of payment, and a further provision that the trustees shall certify and deliver the bonds secured to or upon the order of the company, such mortgage is not fraudulent and void under the rule laid down in *Owen* v. *Arvis, 2 Dutch. 123*, and *National Bank of Metropolis* v. *Sprague, 6 C. E. Gr. 50*.

*Mr. George F. Seymour, Jr.,* for the complainant.

*Mr. Albert Chandler Wall,* for the defendants.

STEVENS, V. C.

This is a creditors' suit, brought to set aside a mortgage because it is said to have been given by the defendant, F. G. Otto

& Sons, a corporation, while insolvent, or in contemplation of insolvency. If relief be denied on this ground, then it is contended that the mortgage is fraudulent,[1] because it was contrived with intent to hinder and delay creditors, and so void as to complainant, under section 12 of the act to prevent frauds and perjuries.

The material facts are these: On April 1st, 1900, the defendant corporation executed a mortgage for $115,000 to the complainants, Zenas E. Newall and George R. Turnbull, to secure the payment of one hundred and fifteen bonds of $1,000 each. The mortgagees were to hold the property mortgaged in trust for the equal and proportionate benefit of the respective persons and corporations who should at any time own the bonds. At the time the mortgage was made the assets of the mortgagor amounted to $477,534.46, the liabilities to $268,300.73. Among the creditors of the company were the East River National Bank, to which the company was liable to the amount of $55,000, on notes made or endorsed for the benefit of Paillard & Company, and Raymond Jenkins, president of the bank, to whom the company was liable to the amount of $20,000, on notes made or endorsed for the benefit of the same firm. The evidence shows that the corporation of F. G. Otto & Sons, and its predecessors, had successfully prosecuted the business of manufacturing music boxes and surgical instruments for many years. Among its selling agents was the firm of Paillard & Company. This firm, in the spring of 1899, had, it is alleged—through bad management, become very much involved. It had then given over the control of its business to Gustav Otto, the president of F. G. Otto & Sons. It was apparently this that led to the endorsement by the corporation of the Paillard paper to the amount I have already stated ($75,000). On February 13th, 1900, Paillard & Company made an assignment under the New York Assignment law. Its liabilities amounted to $110,994.49 and its nominal assets to $144,945.57, but not more than $25,000 has been realized from sales. It has, however, other property, chiefly real estate; of what value does not appear. On the day the deed of assignment bears date, there was a special meeting of

the board of directors of F. G. Otto & Sons, at which it was resolved "that in the judgment of this board it is advisable, and most for the benefit of F. G. Otto & Sons, a corporation, that the same should be forthwith dissolved," and to that end a meeting of stockholders was ordered to be held on March 16th following, but no meeting was in fact held. The resolution had been preceded by a resolution passed on February 9th, 1900. It is said in the minutes of that meeting that in view of the fact that notes were coming due shortly which could not be taken up, Mr. Cooley offered a resolution that the board order a meeting of the board of directors, to be called for February 13th, for the purpose of taking such action as might be necessary pursuant to the laws of New Jersey for the dissolution of the corporation. The stockholders' meeting called at the meeting of February 13th did not, as I have said, take place, there being no quorum present, and the proceedings for dissolution were dropped. They appear to have been discontinued because the company found itself in a position to go on with its business. A statement of its assets and liabilities, prepared by an expert accountant of long experience, Mr. Yalden, had been presented by the president of Otto & Sons to the president of the East River bank. This statement showed assets amounting to $510,-200.73; of floating liabilities amounting to $174,532.42; of mortgage indebtedness amounting to $29,500, and of profit and loss amounting to $9,268.31. This statement, however, did not include $55,000 of liability incurred on behalf of Paillard & Company. The president of the bank was so favorably impressed with this showing that he agreed to lend the company, of his own money, $40,000, and to take forty bonds, to be secured by the mortgage of $115,000, the Otto company giving to his bank the remaining seventy-five bonds as security for the Paillard paper which had been protested. The president testifies that he does not remember how the amount of his loan was arrived at, but he says "that was thought to be a sum that would put them in a very easy-going shape." He paid it in installments, between April and October, 1900. The company

Regina Music Box Co. *v.* Otto & Sons.

continued to prosecute their business until May 18th, 1903, when the trustees under the mortgage took possession, and have carried on the same business ever since. The evidence is that at no time since the mortgage was made did the company's running expenses exceed their receipts. On the contrary, it appears that a small profit was made. The trustees took possession for the somewhat singular reason (considering the small amount of the complainant's judgments, viz., $3,365.07) that they desired that complainant should not be in a position to levy an execution with effect. The Regina company and Otto & Sons were competitors in the business of manufacturing music boxes. On January 15th, 1900, the former filed its bill in the United States circuit court charging Otto & Sons with an infringement of their patent rights. The suit was litigated until March 18th, 1902, when a final decree was made against the Otto company for infringement, awarding damages to the amount of $2,763.55. Two other suits for other infringements had a like termination, the damages awarded on the same day in the one case being $263.81, and in the other $337.71. Executions issued thereon were returned unsatisfied; then alias executions issued, which are still in the hands of the marshal, and thereupon the complainant instituted this proceeding.

The first question to be considered is whether the mortgage of $115,000 was made when the company was insolvent or contemplated insolvency. Section 64 of the Corporation act of 1896, which is a copy of the act of 1895 (*P. L. of 1895 p. 166*), provides as follows:

"Whenever any corporation shall become insolvent or shall suspend its ordinary business for want of funds to carry on the same, neither the directors nor any officer or agent of the corporation shall sell, convey, assign or transfer any of its estate, effects, choses in action, goods, chattels, rights or credits, lands or tenements; nor shall they or either of them make any such sale, conveyance, assignment or transfer in contemplation of insolvency, and every such sale, conveyance, assignment or transfer shall be utterly null and void as against creditors; *provided,* that a *bona fide* purchase for a valuable consideration, before the corporation shall have actually suspended its ordinary business, by any person without notice of such insolvency or of the sale being made in contemplation of insolvency, shall not be invalidated or impeached."

This section is identical with section 2 of the old act to prevent frauds by incorporated companies and must receive the same construction. *Frost* v. *Barnert, 11 Dick. Ch. Rep. 291.* It forbids the preference of any creditor after insolvency, known or contemplated (*Wilkinson* v. *Bauerle, 14 Stew. Eq. 635, 641*), but does not invalidate a *bona fide* purchase for value, made before the company had actually suspended its ordinary business by a person not having notice.

Complainant's contention is that at the time the mortgage was made insolvency existed, or was contemplated. Of the $115,000 secured, $40,000 was for cash paid at the time; $75,000 was for pre-existing indebtedness. As to these there is this distinction: If a company be in fact insolvent, or if it contemplate insolvency, it cannot secure a pre-existing debt, whether the mortgagee have or have not notice. But if the mortgagee advance money to an insolvent company, or to a company contemplating insolvency, and take a mortgage at the time of the making of the advance, then, if he has no notice, his security will stand. In the case at bar, it is perfectly manifest that the president of the bank had no notice of insolvency, if we give to the word "insolvency" its ordinary meaning. The carefully-prepared Yalden statement showed that the assets were more than double the liabilities, and if to those liabilities we add $55,000, representing the company's liabilities on the Paillard notes, not included in that statement, and deduct the items treasury stock, $21,300, and experimental work, $11,306.27, the statement still shows that the assets exceeded the liabilities by over $200,000. So that the company did not appear to be insolvent in the sense that its assets were insufficient to pay its debts. Nor was it insolvent in the sense that it had suspended its ordinary business of manufacturing, for it was then actually engaged in manufacturing, and it continued to be so engaged for three years thereafter. It is clear, then, that the president had no notice of actual insolvency in either of the senses I have mentioned. It is also clear, as it seems to me, that the president of the bank had no notice that the company contemplated insolvency in either of these senses. To contemplate insolvency

within the meaning of the act, is to have in mind something more than the mere possibility of insolvency. The failure of his debtors to make prompt payment, the occurrence of some unexpected event, the stringency of the money market, may create an apprehension in the mind of the manufacturer that he may be unable to meet his obligations as they mature. He may, for the moment, be doubtful whether he will or will not be able to go on. If he succeeds in borrowing enough money to pay his obligations and goes on, he cannot be said to have contemplated insolvency at the time he borrows the money, merely because he had in mind at some former time the possibility of becoming insolvent in case he failed to borrow it. This is the language of common sense, no less than of the authorities. In Webster's dictionary, it is said "we contemplate a design when the means are at hand and our decision is nearly or quite made." In *Burrill's Law Dictionary,* contemplation is defined as "having in view; consideration of an act or course of conduct *with the intention of doing or adopting it."* In *Buckingham* v. *McLean, 13 How. (U. S.) 167,* contemplation of insolvency is spoken of as a contemplation of an inability to pay, as debts should become payable—*"whereby a man's business is broken up."* In *Belcher* v. *Prittie, 10 Bing. 423,* Justice Bosanquet says: "The more important part of the case is whether this was done in contemplation of bankruptcy;" in other words, "whether Mr. M., at the time he assented to this proposal of his son [a proposal to secure certain indebtedness] expected that bankruptcy would take place; * * * whether he knew, or believed, upon the 1st of July that his affairs would end in bankruptcy." To illustrate: When Gustave Otto found that the Paillard failure had made it necessary for his company to raise money, he probably said to himself: "My company must either borrow $40,000 in cash or suspend business." He was then contemplating insolvency on a contingency; but when he was informed that Mr. Jenkins was willing to lend the money, the contingency on which he had contemplated it not having happened, the idea of insolvency ceased to be present to his mind and he no longer contemplated it. When his company executed the mortgage he contemplated, not insolvency, but the reverse.

Any other construction of the statute would make it impossible for a corporate manufacturer, temporarily in need of money, to procure it by pledge of his property, although by procuring it he would terminate his embarrassment. The lender's security would always be open to attack, and to successful attack, if at any time in the future the borrower failed. Section 64 does, indeed, make a distinction between the case of an antecedent debt and the case of a *bona fide* purchase for valuable consideration paid at the time by a person without notice. In the former case, if the company be, in fact, insolvent, or if it contemplate insolvency, the ignorance of the creditor is immaterial (*Brower* v. *Harbeck, 9 N. Y. 594*), while in the latter want of notice will protect him. But this protection would not go very far if contemplation of insolvency meant contemplation by the lender of its mere possibility on a contingency which does not happen. The present case presents both phases of the question, for Mr. Jenkins paid $40,000 in cash and his bank took seventy-five bonds as security for an antecedent debt. The statement handed to Mr. Jenkins, and on which he acted, showed that the company had only $755.63 in cash and he must have thought it possible that if he, or someone else, did not lend the company money it would be forced to suspend; in other words, he must have contemplated insolvency as an alternative possibility. As he did not contemplate it when he took the mortgage and made the loan, I think that, as to the forty bonds, they are clearly within the proviso of section 64.

As to the seventy-five bonds taken as security for the antecedent indebtedness, there are other relevant facts. These facts were known to the company, but not to Mr. Jenkins. As I have said before, when the question relates to a mortgage, given to secure money paid at the time, notice must be brought home to the lender. It is otherwise when an antecedent debt is secured; then the only question is whether the company was, in fact, insolvent or was contemplating insolvency.

On February 9th, 1900, the president of F. G. Otto & Sons, at a directors' meeting, reported that he had tried to get additional capital and had failed. The minutes state that, in

view of the fact that notes are coming due shortly which could not be taken up, Mr. Cooley offered a resolution that a meeting of the directors be called for February 13th to take such action as might be necessary to dissolve the corporation. Standing alone, this resolution would be evidence that the corporation contemplated insolvency in the sense that it would be obliged to suspend and go out of business for want of funds. In the subsequent minutes, of March 9th, it is stated that the president reported that negotiations for additional capital were proceeding satisfactorily. The treasurer testifies that the directors, after mature consideration, "had figured," as he expresses it, that if they raised $40,000 they would be on "easy street;" that, after the resolution for winding up was passed, the negotiations for additional capital took a favorable turn, and that the negotiations referred to in the minutes of March 9th were those which resulted in the loan of $40,000 by Mr. Jenkins. Now, it seems to me very plain that if in February the company contemplated insolvency, in the sense of suspension, as the result of a failure to procure additional capital, in March they contemplated proceeding with the business, because of their successful negotiation for a loan.

I have thus far shown that the company was not insolvent in the sense that its assets, ultimately, were not sufficient to pay its debts, and I have now shown that it was not insolvent in the sense that it was unable, or thought that it would be unable, to proceed with its ordinary business for want of funds. In point of fact, as I have said, it continued to conduct its business at a slight profit for three years after the mortgage was made. Counsel was compelled, under stress of these admitted facts, to take another ground, and that is, as I understand his argument, that on April 1st, 1900, the date of the mortgage, a large amount of paper, on which the company appeared as maker or endorser, had gone to protest. I dismiss from view the attachment said to have been issued by one Patterson on a claim for $600, because there is no legal proof that it was issued in April, 1900, or, indeed, that it was issued at all. Counsel argued that the fact that the company's paper had gone to. protest showed that it had suspended business in

the sense that there was, in the words of Chancellor McGill, in *Fort Wayne Electric Corporation* v. *Franklin Electric Light Co., 12 Dick. Ch. Rep. 13*, "an inability to presently pay indebtedness" and hence a "suspension of that function." The chancellor was, in that case, considering an application for the appointment of a receiver. The proof was that, while the company was then carrying on the business of lighting the streets of Cape May, judgments had been recovered against it which it was unable to satisfy, and which its directors did not propose to satisfy, and that there was "a strong disposition" to avoid paying some of its unsecured creditors.

It is obvious that the case at bar is, in its peculiar situation, quite unlike that before the chancellor. The fact that the notes of a manufacturing company have gone to protest may be, and often is, *prima facie* evidence of insolvency; but it is obvious that such evidence is open to explanation. The protest may have occurred by accident, or because it was intended, in good faith, to contest their validity, or because it was without funds to pay through some unexpected delay on the part of one or more of its own debtors to make prompt payment. If the note were paid or the claim successfully defended it could hardly be asserted afterward that, for this reason alone, the company was insolvent. And I do not think it could be said that if the company did not pay in cash but had sufficient credit to renew its notes, and did, in fact, renew them and went on with its business, it should be regarded as insolvent, if it also appeared that its assets exceeded its liabilities. It is obvious that the whole situation would have to be considered. Speaking of the principle which should guide a court in appointing receivers for insolvent corporations, Vice-Chancellor Van Fleet, in *Atlantic Trust Co.* v. *Consolidated Electric Storage Co., 4 Dick. Ch. Rep. 402*, in a passage quoted by the chancellor in the case I have just mentioned, said: "The principle which I think should control the court in the exercise of this power is this— never to appoint a receiver unless the proof of insolvency is clear and satisfactory and unless it also appears that there is no reasonable prospect that the corporation, if left alone, will soon be placed, by the efforts of its managers, in a condition

of solvency." If this be the true principle where the appointment of a receiver is concerned, certainly *a fortiori* must it be the true one where the dispute is over the validity of a mortgage, taken by a creditor in good faith, in the ordinary course of its business, a considerable period of time before its failure.

There were three banks which, on April 1st, 1900, held paper of Paillard & Company and of Otto & Sons that went to protest, either just before or just after that date. The East River bank, as has been already stated, held notes and bills amounting to $55,000, and its president held notes for $20,000 more. It was to secure these notes that the Otto company bonds, to the amount of $75,000, were given. So far as this bank was concerned, the indebtedness was satisfactorily adjusted. It had never threatened suit and the evidence shows that the arrangement looking to an adjustment of its claim was at least under way before the notes were protested. They were protested, no doubt, for the purpose of fixing the liability of the endorsers, of which there were several. The Hoboken bank held paper on which Otto & Sons appeared as maker or endorser to the amount of $31,792.60. The first of the notes held by this bank became due and was protested on February 15th; the last on April 10th. They were all secured by a mortgage made by Charles W. Cooley and Emma Cooley, dated March 19th, 1900; delivered on April 14th. One of the notes (for $9,250) had been made by Cooley himself, and a complete settlement and discharge of the account was had on December 13th, 1901, a part of the indebtedness having been paid in cash and a part by transfer of the property mortgaged. Of the particulars of the notes in the Germania bank we know nothing. The treasurer of Otto & Sons testified that they were protested about March 1st, 1901, which is probably a mistake, and that they are still outstanding. In the absence of evidence to the contrary, and assuming that they were protested in March, 1900, it must be concluded that they were satisfactorily provided for or secured.

Now, it seems to me that on these facts the insolvency of the company at the time the mortgage was given is far from

being clearly and satisfactorily established. Its assets were greater than its liabilities. It had never ceased to conduct its ordinary business in the ordinary way. The evidence is that up to May, 1902, it had never defaulted in its weekly payroll of from $1,400 to $2,000. There are a great many solvent companies, I imagine, which at some period or another of their existence have been pressed for money, and have, because of such pressure, been obliged to ask for time. If the test be present inability to pay *in cash* all maturing claims, then a successful effort to obtain further time, by a pledge of their property, is a demonstration of their insolvency.

By section 42 of the act of 1849 it was enacted that in case of the insolvency of any company formed under its provisions the laborers in the employ thereof should have a lien upon the assets thereof for the wages due them, respectively, which should be paid prior to any other debt, &c. It was held by Chancellor Green, in *Bedford* v. *Newark Machine Co., 1 C. E. Gr. 117,* that the company was to be deemed to be insolvent when it suspended business, and that the lien should be deemed to attach as of that time. He said: "The act respecting insolvent corporations under which these proceedings were instituted looks to the suspension of the ordinary business of the company or some overt act by which its insolvency can be ascertained and declared. The court cannot, upon an inquiry of this nature, undertake to investigate the financial ability of the company at previous periods, founded upon a mere failure to meet its engagements or upon the actual state of its finances, after its business has been suspended." This language has been quoted with approval in subsequent cases. *Delaware, Lackawanna and Western Railroad Co.* v. *Oxford Iron Co., 6 Stew. Eq. 193; Wright* v. *Wynockie Iron Co., 3 Dick. Ch. Rep. 29.* If these decisions do not govern the construction of section 64, they at least suggest caution in undertaking to avoid securities given a considerable time before suspension of business.

To summarize: The evidence in the case at bar shows that Otto & Sons had up to May, 1903, carried on an established business of many years standing, successfully; that it did not

suspend its ordinary business until that time, and that its assets in the spring of 1900 exceeded its liabilities by $200,000. One of its selling agents (Paillard & Company) had become embarrassed. It was thought that this embarrassment had been caused by bad management, and so, by resolution of April 14th, 1899, Gustav Otto, its president, was authorized to take it into his own hands. This he did, but without success. When Paillard & Company failed, Otto & Sons became straitened for funds, and the notes of which I have spoken—which seem to have been nearly all Paillard paper—went to protest. This created an embarrassment, which was, as I have said, met (1) by a loan of $40,000 from the president of the East River bank; (2) by an issue of bonds to secure the Paillard paper held by that bank; (3) by an arrangement with the Hoboken bank by which a director first mortgaged and then conveyed certain property of his own in satisfaction of its claim; (4) by an arrangement with the Germania bank, which I must assume was satisfactory to it, for there is no evidence that it pressed its claim. An extraordinary emergency was met by these means and the company went on. I fail to find in these facts such clear evidence of insolvency, actual or contemplated, on April 1st, 1900, as compels me to avoid the mortgage in controversy.

The complainant next contends that the mortgage is voidable under the principle of the cases of *Owen* v. *Arvis, 2 Dutch. 23,* and *National Bank of Metropolis* v. *Sprague, 6 C. E. Gr. 50.* The precise point of objection is, first, that the mortgage gives the trustees the right, upon default, to sell the property which the company then owned and which it might thereafter acquire, to the prejudice of the general and unsecured creditors. This question was decided in *Lister* v. *Simpson, 11 Stew. Eq. 438;* affirmed on appeal, *12 Stew. Eq. 595, 607.* Vice-Chancellor Van Fleet said: "The question is this: Is the mortgage of a stock of merchandise, which by its terms permits the mortgagor to sell the property mortgaged in the usual course of business, and also provides that its lien shall extend to such goods as may be subsequently purchased to replace those sold, fraudulent, *ipso facto,* as to creditors?" He answered both questions

38

Regina Music Box Co. *v.* Otto & Sons.

in the negative, although it appeared that the stock mortgaged had been almost entirely changed, and that nearly all the goods purchased to replace the goods sold had been furnished by the execution creditor, who had actually levied and who was claiming, by virtue of his levy, priority over the lien of the mortgage.

The second objection interposed on this branch of the case is that the mortgage provided that the trustees should certify and deliver the bonds secured thereby to or upon the order of the company. With or without this provision, this, in a mortgage of this kind, would be the usual course. The bonds would be delivered as the company would direct. I am quite unable to see how such a provision would *per se,* and aside from the use that might be made of it, render it fraudulent. I suppose that in the case of most of the mortgages that are given by railroad or industrial companies, the bonds are sold or disposed of by the trustees under the direction of the mortgagor. The case in hand seems to me to be distinguishable from *National Bank of Metropolis* v. *Sprague* in two vital particulars—*first,* the mortgagor was not, as I view the evidence, insolvent. In all the cases relied on (*Owen* v. *Arvis, National Bank of Metropolis* v. *Sprague, supra; Dewitt* v. *Van Syckle, 2 Stew. Eq. 210*) this was regarded as one of the controlling facts; *second,* the mortgage in the case at bar was given pursuant to an antecedent agreement with a particular creditor for the security of that creditor and of its president. In the case of *National Bank of Metropolis* v. *Sprague,* the mortgage was made to trustees without any purpose of then securing any particular creditor, but after it was executed the bonds were left in the hands of the mortgagors for distribution among their creditors, or for such distribution as they might choose to make of them, and then they were held in the air, so to speak, and used as a club with which to compel creditors to take them. There was some criticism based upon the fact that the $40,000 was not all paid at the time the mortgage was executed. It was in fact paid between April 1st and October 1st, 1900, as the company needed it. It was all paid while it continued to be a solvent and going concern. Under these circumstances, I can see no real re-

semblance in essentials between the case in hand and those relied upon.

It is next insisted that if the complainant's judgment and execution be not a lien prior to the lien of the mortgage in all respects, it is at least a prior lien as to some of the property sought to be mortgaged. It is argued that it does not cover after-acquired property purchased with money of the company derived from the sale of its merchandise or from book account, or money in its possession when the complainant's execution issued. The case of *New York Security and Trust Co.* v. *Saratoga Gas and Electric Light Co., 53 N. E. Rep. 758,* and other like authorities, are relied upon to sustain this position. So far as the question of after-acquired property is concerned, that has been disposed of by the before-cited case of *Lister* v. *Simpson.* So far as debts due the corporation and money—that is, coin or bank bills—are concerned, the facts are as follows: The property was taken over by the trustees under the mortgage on May 8th, 1903. The first execution was issued by complainant on April 4th, 1902, and was returned unsatisfied. The second was issued on July 28th, 1902, and is still unexecuted in the hands of the marshal. The execution is not a lien upon choses in action. *Whitney* v. *Robbins, 2 C. E. Gr. 360; Tanlum* v. *Green, 6 C. E. Gr. 364.* And no coin or bank bills are shown to have been in the possession of the company after the execution issued. The company had, no doubt, one or more bank accounts, but while we, in common parlance, speak of money in bank, in legal contemplation the bank stands toward its depositor as any other debtor. Even if the case made by the bill were broad enough to cover this question, I do not think the plaintiff's contention could prevail. In the case of *New York Security and Trust Co.* v. *Saratoga Gas and Electric Light Co., supra,* a receiver had been appointed in supplementary proceedings, and the contest was between him and a receiver appointed in a mortgage foreclosure suit on the same day. A different question was therefore presented by that case, and it is unnecessary to consider whether it be, or be not, in all respects consistent with *Lister* v. *Simpson, supra.*