IRVING P. HOAGLAND, JEAN D. HENRY and LOUIS GOLDFARB, as trustees in bankruptcy of W. J. MacEvoy Construction Company, bankrupt, complainants,

*v.*

UNITED STATES TRUST COMPANY, defendant.

IRVING P. HOAGLAND, JEAN D. HENRY and LOUIS GOLDFARB, trustees in bankruptcy of W. J. MacEvoy Construction Company, bankrupt, complainants,

*v.*

CLIFFORD F. MACEVOY COMPANY, defendant.

[Decided May 4th, 1932.]

490

*Messrs. Lum, Tamblyn & Colyer (Mr. Ralph Lum* and *Mr. Samuel Kaufman,* for counsel), for the complainants.

*Messrs. Riker & Riker (Mr. Andrew Van Blarcom,* of counsel), for the defendant United States Trust Company.

*Mr. Milton M. Unger,* for the defendant Clifford F. MacEvoy Company.

BERRY, V. C.

The complainants seek to set aside as fraudulent, under section 64 of the General Corporation act, a payment of $20,000 to the United States Trust Company on account of a note of the bankrupt held by that company on April 1st, 1930, and a payment of $4,500 to the defendant Clifford F. MacEvoy Company in satisfaction of a note of the bankrupt in that amount held by this defendant on April 4th, 1930. The W. J. MacEvoy Construction Company was adjudicated a bankrupt on July 2d, 1930, a voluntary petition having been filed on June 11th, 1930. Both of the payments involved were made for past indebtedness.

Section 64 of the General Corporation act provides in part that "whenever any corporation shall become insolvent or

shall suspend its ordinary business for want of funds to carry on the same, neither the directors nor any officer or agent of the corporation shall sell, convey, assign, or transfer any of its assets, effects, choses in action, goods, chattels, rights or credits, lands or tenements; nor shall they or either of them make any such sale, conveyance, assignment or transfer in contemplation of insolvency, and every such sale, conveyance, assignment or transfer shall be utterly null and void as against creditors." The sole question here involved is whether or not, on the dates of these two payments, the W. J. MacEvoy Construction Company was insolvent. The question of the payments being "in contemplation of insolvency" may be entirely eliminated, as I find no evidence which would indicate that insolvency was in contemplation either by the bankrupt company itself or the defendants on the dates in question, except in the sense stated by Vice-Chancellor Grey in *Reed* v. *Helois Carbide Specialty Co., 64 N. J. Eq. 231* (at *p. 243*). In that case Vice-Chancellor Grey said:

"In all business enterprises which are threatened with financial embarrassment, insolvency is necessarily within contemplation. It is very rarely, indeed, that the financial situation of a corporation is so perfectly defined that it continues solvent up to a given instant, and is immediately thereafter insolvent. In almost all such cases there is a period of struggle, during which efforts are made to rescue the enterprise from threatened insolvency."

But in *Regina Music Box Co.* v. *F. G. Otto and Sons, 65 N. J. Eq. 582* (at *p. 586*), Vice-Chancellor Stevens said: "To contemplate insolvency within the meaning of the act, is to have in mind something more than the mere possibility of insolvency." And, indeed, counsel for complainants in their brief abandon any claim that the two payments in controversy were made in contemplation of insolvency and frankly concede that unless the fact of insolvency on the dates of the payments is established the bills must be dismissed.

There is no doubt in my mind but that at the time these payments were made W. F. MacEvoy, who was the controlling

factor in the bankrupt company, had no thought but that he would be able to carry on. There is no evidence whatever from which knowledge of the company's alleged financial embarrassment might be imputed to the defendant trust company. The other defendant was fully aware of the financial condition of the W. F. MacEvoy Construction Company, but that knowledge, in my judgment, justified the belief that the debtor company was entirely solvent. But knowledge of insolvency, either by the officers of the debtor corporation itself or by the creditors who received the contested payment is, of course, immaterial. The *fact* of solvency or insolvency is controlling. But "the mere circumstance that the liabilities of a corporation exceed its assets does not necessarily constitute insolvency. A corporation, so circumstanced, which is actively pursuing its regular business with reasonable expectations of business conditions improving may not be deemed insolvent within the intent of section 64." *Turp* v. *Dickinson, 100 N. J. Eq. 41* (at *p. 45*).

In *Schneider* v. *Hamilton Trust Co., 105 N. J. Eq. 373,* Vice-Chancellor Backes said (at *p. 375*) :

"There can be no doubt that the liabilities of the Savoy Company exceeded its assets and that it was in fact insolvent when the exchange was made. Calling the creditors together shortly thereafter indicates that; but that it was at the time insolvent in the statutory sense, *i. e.,* 'a general inability to meet pecuniary liabilities as they matured, by means of either available assets or an honest use of credit,' is by no means established. It was functioning normally. It had not actually suspended its ordinary business. Its mill was in full operation, and the exchange was in the regular course of business."

The word "insolvent" as used in section 64 of the General Corporation act must be defined the same as "insolvent" as used in section 65 of that act; that is, a corporation is insolvent when there is a general inability to meet pecuniary liabilities as they mature by means of either available assets or an honest use of credit. *First National Bank of Lyndhurst* v. *Bianchi & Smith, Inc., 106 N. J. Eq. 333.* See, also,

*Skirm* v. *The Eastern Rubber Manufacturing Co., 57 N. J. Eq. 179;* *Wright* v. *American Finance and Securities Co., 85 N. J. Eq. 181* (at *p. 183*) ; *Hoover Steel Ball Co.* v. *Schafer Ball Bearings Co., 89 N. J. Eq. 433.*

It is pertinent, therefore, to inquire as to what condition of solvency or insolvency will justify the appointment of a receiver to wind up the affairs of a corporation.

In *The Atlantic Trust Co.* v. *The Consolidated Electric Storage Co., 49 N. J. Eq. 402,* which involved an application for a receiver of a corporation on the ground of insolvency, Vice-Chancellor Van Fleet said:

"The principle which I think should control the court in the exercise of this power is this: never to appoint a receiver unless the proof of insolvency is clear and satisfactory, and unless it also appears that there is no reasonable prospect that the corporation, if let alone, will soon be placed, by the efforts of its managers, in a condition of solvency."

This language was quoted with approval by Chancellor McGill in *Fort Wayne Electric Corporation* v. *Franklin Electric Light Co., 57 N. J. Eq. 7,* and by Vice-Chancellor Stevens in *Regina Music Box Co.* v. *F. G. Otto & Sons, supra.* In the latter case Vice-Chancellor Stevens added:

"If this be the true principle where the appointment of a receiver is concerned, certainly *a fortiori* must it be the true one where the dispute is over the validity of a mortgage, taken by a creditor in good faith, in the ordinary course of its business, a considerable period of time before its failure."

As pointed out by Vice-Chancellor Leaming in *Sternberg* v. *Vineland Trust Co.,* unreported, but referred to and quoted in *Koch* v. *Morsemere Trust Co., 107 N. J. Eq. 516,* and *Smith* v. *Washington Casualty Insurance Co., 110 N. J. Eq. 122* (at *pp. 133, 134*), there are two classes of insolvency; first, insolvency "in the popular sense of that word, *i. e.,* that it owes more money than its assets can ever be made to realize;" and second, a technical insolvency in the sense that it does not possess available resources to meet its present needs. There Vice-Chancellor Leaming had under consideration the Trust Company act, but the same principle applies

to the question of insolvency under the General Corporation act. It is not every case of insolvency which will warrant the appointment of a receiver. Where there is an absolute insolvency, that is, insolvency in its popular sense, as described by Vice-Chancellor Leaming, a receiver would generally be appointed; but in a technical insolvency, which, as I take it, merely means a case where the corporation's assets are frozen or partly frozen and its current assets are not sufficient to meet its current liabilities, but where there is no suspension of business and the corporation is functioning in its usual manner, and especially where the business is not being conducted at a loss, then a receiver would not ordinarily be appointed. In *Auburn Button Works, Inc.*, v. *Perryman Electric Co., Inc., 107 N. J. Eq. 554*, Vice-Chancellor Fallon, in refusing to appoint a receiver for the defendant company, said:

"Under said act a corporation is insolvent when there is a general inability to meet pecuniary liabilities as they mature by means of either available assets or an honest use of credit. Considerable of defendant's assets appear to be what are commonly termed *frozen assets;* that is, such as may not readily be turned into cash except at a sacrifice; but in this respect the defendant is not unlike many other business concerns of the present day. The general business depression of the past few years, and particularly such as experienced within the past year, has seriously affected many business concerns. The proofs herein disclose that the defendant experienced difficulty in meeting its pecuniary liabilities as they matured by means of available cash, and because thereof sought extension of time within which to make payment of its indebtedness to certain of its creditors. * * * I appreciate that there are many corporations doing business in this period of business depression which if required to prove themselves without the definition of insolvency as known to our law, could not do so, yet are solvent in the ordinary sense of the word."

He then quoted from *Greenbaum* v. *Lafayette and Broad Realty Corp., 96 N. J. Eq. 317,* as follows:

"Depriving a statutory legal business entity of its corporate

life, is a judicial act which should not be lightly exercised, since the intervention of the court carries with it very often in practical execution not only the destruction of the livelihood of those who subsist by its existence, but also the investments of those who have confidently contributed their means to its successful creation, and finally, but not at all the least of its unfortunate results, such an interposition may be the means of removing from the field of honest successful endeavor, a business asset of substance and importance to the well-being of the state."

Recurring now to the statement in the case of *First National Bank of Lyndhurst* v. *Bianchi & Smith, Inc., supra*, "that the word 'insolvent' as used in section 64 of the Corporation act must be defined the same as 'insolvent' as used in section 65," it is obvious that to apply the rule of insolvency in a broader manner under section 64 than it is applied under section 65 would result in inestimable harm because, if there were a technical insolvency which would not justify the appointment of a receiver, and the corporation were permitted to exercise its franchises while in that state of technical insolvency, contract and pay debts in the regular course of its business, no person dealing with the corporation under those circumstances would be safe; there would always be the possibility, or even the probability, that those receiving payment of their just claims during that period would be obliged to repay the moneys thus received to a receiver thereafter appointed; and incidentally for the benefit of creditors whose claims arose after the date of such payment. I think it was not the intention of the legislature that a corporation thus lawfully exercising its franchises should not with safety carry on its business and discharge its obligations as necessity required, and that claimants against the corporate assets should not be protected for payments thus made where there was no fraud and no thought of unlawful preferences. That this is not a new doctrine, see quotation from the opinion of Vice-Chancellor Stevens in *Regina Music Box Co.* v. *F. G. Otto & Sons, supra*. To hold otherwise, in cases similar to that of which *Auburn Button Works, Inc.,* v. *Perryman*

*Electric Co., supra,* is an example, would be to convert a technical insolvency not justifying the appointment of a receiver into an absolute insolvency from which there could be no escape, because it would be useless to permit, as was done in that case, such a corporation to continue in the exercise of its franchises, irrespective of the probability of its financial recovery. Under such circumstances, if the rule were as stringent as is suggested, no person would deal with the corporation while it was in that condition and it would be futile to permit it to continue in business. It could not do so with advantage to its stockholders and safety to the public, or, indeed, at all. Such a "construction would compel the immediate winding up of every corporation whose financial affairs should become temporarily embarrassed." *Reed* v. *Helois Carbide Specialty Co., supra.* The patient whose life might be saved by a transfusion of new blood, must needs be given the fatal potion—the insolvency decree.

There are perhaps thousands of corporations which, previous to the present economic depression, enjoyed the highest credit rating, but are now struggling for their very existence, a condition recognized and commented upon by Vice-Chancellor Fallon in the *Auburn Button Works Case.* Their unliquid assets will not permit the payment of their maturing obligations in full, but they are carrying on and paying what they can, hoping for a turn of the tide. I cannot think that every partial payment and renewal or extension of obligations by corporations so situated can be branded as a fraud, nor do I believe that such a result was ever intended by the legislature in the enactment of section 64 of the Corporation act or its remote predecessor—An act to prevent frauds by incorporated companies. *P. L. 1829 p. 58* § *2.* The history of this legislation is recorded in the opinion of Vice-Chancellor Grey in *Reed* v. *Helois Carbide Specialty Co., supra* (at *p. 243*) of the report. The very title of the original act shows that it was levelled against fraud in the common acceptation of that term. The rights and liabilities of the parties to this litigation must be determined in the light of this construction of the law.

As the question of insolvency here presented is peculiarly

one of fact, it is necessary to consider, in some detail, the facts and surrounding circumstances in connection with the bankrupt company and the transactions involved on the dates mentioned and during the intervening period up to the adjudication in bankruptcy.

The W. J. MacEvoy Construction Company was engaged in the general contracting business in the city of Newark and surrounding communities, and prior to December, 1929, enjoyed the highest credit rating and discounted all its bills. It was a flourishing, prosperous company and this is conceded. Its income tax report for 1929 showed a liability for income taxes for that year amounting to over $6,500. During 1929 it entered into a contract with the Majestic Hotel Company for the erection and construction of a hotel subsequently known as Hotel Douglas, on a cost plus basis. The estimated cost of the building operation was $1,100,000 and there was an anticipated profit of $110,000 in the contract for the MacEvoy company. After the bankrupt company had begun work on this job, and expended approximately $100,000 therein and committed itself for considerable additional moneys, Mr. Goldfarb, the president and moving spirit of the Majestic Hotel Company, became bankrupt, and the MacEvoy company found itself in a position where it had to lose the money already expended and additional commitments or take over the entire contract and complete the hotel. (Goldfarb, whose bankruptcy was the cause of the subsequent financial difficulties of the MacEvoy company, later, by some strange quirk of fate, became one of the trustees in bankruptcy of the MacEvoy company). At that time the hotel property was encumbered by a first mortgage in the sum of $770,000, due June 1st, 1930, and also by a second mortgage in the sum of $200,000, reduced to $190,000. W. J. MacEvoy and the bankrupt company were on the bond accompanying this mortgage. In an effort to prevent loss because of its expenditures and commitments on the hotel operation, the W. J. MacEvoy Construction Company took over all of the stock of the hotel company and thereafter financed the construction work itself. Of the $770,000 mortgage $270,000 repre-

sented the actual cost of the land on which the hotel was erected. The balance was paid to the contractor during the course of the operation. At the same time or shortly prior thereto the W. J. MacEvoy Company was constructing or had constructed a theatre at Greenwich, Connecticut. This was being done as an investment with the idea of selling the property when completed at a profit; and, of course, after the bankruptcy of Goldfarb, the Hotel Douglas was completed with the same idea in mind. The hotel was completed in December, 1929, and was furnished by the bankrupt company at a cost of some $176,000, of which, on April 1st, 1930, all but $28,000 had been paid. On that date the actual cash investment of the W. J. MacEvoy Company in the Hotel Douglas and furnishings was approximately $400,000 and its total cost was in excess of $1,500,000; and the cash investment in the Greenwich theatre was over $234,000. It had actually cost about $360,000. The only financial statement of the bankrupt company which is offered in evidence as of the time of the controverted payments, other than that prepared by the trustees' accountants after the bankruptcy, is a condensed statement of the assets and liabilities made up by Clifford F. MacEvoy, brother of Warren J. MacEvoy, and the controlling factor in the defendant Clifford F. MacEvoy Company, from data furnished to him by Warren J. MacEvoy, which, in turn, had been furnished to him by his bookeeper. That statement is as follows.

"CONDENSED STATEMENT—ASSETS AND LIABILITIES<br>W. J. MACEVOY COMPANY.

*Assets*

| | | |
|---|---:|---:|
| Cash | $3,200.00 | |
| Securities (pledged) | 41,975.00 | |
| Accounts receivable | 40,000.00 | |
| Balance receivable on 1st Mtg. Greenwich, | 40,000.00 | |
| 2nd Mtg. on Greenwich | 78,000.00 | |
| Bills receivable | 4,000.00 | |
| Tools and equipment, including 2 cars | 3,665.00 | |
| Investment in 523 Mt. Prospect Corp. | 6,500.00 | |
| | | $217,340.00 |
| Douglas Hotel and land | | 1,430,337.00 |
| Hotel furnishings (less stock issued) | | 110,500.00 |
| | | $1,758,177.00 |

*Liabilities*

| | | |
|---|---:|---:|
| Fidelity Union Trust Co. | $75,000.00 | |
| U. S. Trust Co. | 30,000.00 | |
| Franklin Wash Trust Co. (secured) .... | 30,000.00 | 135,000.00 |
| Bills payable (mdse) | 81,999.00 | |
| Accounts payable | 132,256.00 | |
| Accounts payable W.· J. MacEvoy | 14,355.00 | |
| Accrued interest on mtgs. | 20,250.00 | |
| (1) Bills payable (hotel equipment and misc.) (Orp. Co.) | 69,000.00 | 317,860.00 |
| (2) 1st mtg. payable (hotel) due 5/15/30 | 770,000.00 | |
| (3) 2nd mtg. payable (hotel) due 11/1/34 | 190,000.00 | 960,000.00 |
| Capital and surplus | | 345,317.00 |
| | | $1,758,177.00 |

(1) Payable $3,500 per month.
Contingent liability.
Customers notes disc at banks $23,000.
Guarantor on 2nd mtg. sold $50,000.
(2) Renewable for 4½ years on payment of $50,000 fee.
(3) Require amortization $10,000 quarterly."

This statement was compiled in the early part of May, 1930. Early in 1930 the bankrupt company made an agreement of sale of the Greenwich theatre property which, had it been carried out in its original form, would have given the company about $200,000 in cash. For some unexplained reason the ultimate contract dated February 15th, 1930, provided for the payment of considerably less cash on final settlement, and when that settlement was made the actual cash coming to the bankrupt company, including the down payment, was in the neighborhood of $55,000, out of which approximately $16,000 was used to pay mechanics' lien claimants against that property. During the period from December, 1929, to April, 1930, some difficulty was experienced by the bankrupt company in meeting its financial obligations as they came due. Some creditors were pressing for payment, but not unreasonably so, and apparently no serious trouble was experienced in obtaining credit extensions from its creditors, or in the renewal of outstanding notes as they became due. Two suits at law had been started against the company prior to April 1st, 1930, for comparatively small amounts;

one claim had been paid in full and the other in part, and thereafter held in abeyance by agreement of the parties. Judgment was entered in only one of these suits and that not until after the bankruptcy proceedings were instituted. On February 28th, 1930, the bankrupt company borrowed from the defendant Clifford F. MacEvoy Company $4,500 on a note payable March 15th, and it had previously borrowed from the United States Trust Company on various notes the sum of $50,000, partially secured by collateral. There was also a $75,000 loan with the Fidelity Union Trust Company, unsecured, and a loan of $25,500 with the Franklin-Washington Trust Company. · The moneys borrowed from the United States Trust Company and from the Clifford F. MacEvoy Company were used by the bankrupt company in the regular course of its business and in the payment of current obligations. At the time the $4,500 was borrowed from the Clifford F. MacEvoy Company the understanding was that it was to be repaid out of the proceeds of the sale of the Greenwich theatre, and after the contract for sale of that theatre was made payment of the notes held by the United States Trust Company was promised upon the settlement. These notes were renewed for short periods of time and finally combined into one note of $50,000 just prior to the settlement, which was on April 1st, 1930, and in anticipation of that settlement. Payments had also been promised to the Fidelity Union Trust Company and other creditors. When the settlement was made, however, the bankrupt company found that instead of getting $200,000 in cash, later reduced to $100,000, it received only about $55,000, $16,000 of which had to be paid to mechanics' lien claimants, as above stated, and of the balance of about $40,000, $15,000 had been received on the execution of the contract of sale, so that the actual cash received by the bankrupt company and available for payment to its creditors was some $23,500. The balance of the purchase price coming to the MacEvoy company was made up of mortgages in which were included a second participating interest to the extent of $50,000 in the first mortgage, and a second mortgage of $75,000 and another mortgage of $13,000. Be-

cause of obligations of the bankrupt company which could be offset against these two latter mortgages, one was later reduced to $45,000 and the other to $3,000. These mortgages are now held by the trustees. Immediately upon receiving check in settlement, Warren J. MacEvoy went to the United States Trust Company and deposited this check and then drew a check against this deposit for $20,000, which he de-. livered to the trust company and renewed the $50,000 note for $30,000. He explained to his brother Clifford that he. did not get sufficient funds from the settlement to pay the note held by the Clifford F. MacEvoy Company and within· a few days thereafter he borrowed from the Franklin-Washington Trust Company, against collateral already deposited there, $4,500 additional with which he paid that note. This. increased the bankrupt company's loan at. the Franklin-Washington Trust Company to $30,000 against which he had. collateral valued at that. time at over $72,000. There were also individual liabilities of W. J. MacEvoy to that bank which reduced the equity in that collateral to about $27,000. On February 28th, 1930, the bank loans and trade notes of the bankrupt company were in excess of those outstanding on April 1st, 1930, and the amount due trade creditors had been. decreased by about $10,000 between February 28th and April 1st. In fact, the company had $14,000 less debts on April 1st, 1930, than it had on February 28th preceding. The company continued its business right up until June 10th, the day before the petition in bankruptcy was filed, and after April 1st, Warren J. MacEvoy sold stocks owned by him personally and used the proceeds in the company's business. That, and the fact that he had an excess of collateral at the Franklin-Washington Trust Company, that his brother was prepared to advance $150,000 on a certain contingency, and that other friends had offered to advance him money, shows that the company still had available credit. This bankruptcy proceeding was precipitated by a refusal of the holder of the first mortgage to renew it. Arrangements had been previously made to renew this mortgage by payment of a $50,000 bonus on its due date, but these arrangements suddenly fell·

through; however, on April 1st and April 4th it was anticipated that this arrangement for the renewal of the mortgage would be carried out. There was complete justification for this belief because Lehman, the president of the mortgagee company, had, at the time of Goldfarb's failure, assured MacEvoy that he would see him through if he continued with the hotel job. Unfortunately MacEvoy did not get this undertaking in writing and was not in a position to resist Lehman's attempt to squeeze a $50,000 bonus out of the MacEvoy company. This company's major difficulties which made the crash inevitable were all encountered *after* April 4th, 1930. It was not until after this mortgage was called on June 1st that bankruptcy was found imminent. The first mortgagee began foreclosure proceedings on the day before the petition in bankruptcy was filed. There was then no other creditor pressing the company, as the company continued in business paying its obligations as they matured, or renewing them, right up until June 10th, 1930. There had been no suspension of business, no commercial paper was past due, none had been protested, and no creditor had served any ultimatum as to the payment of its claim. At valuations which the bankrupt company thought proper its assets on April 1st, 1930, were approximately $345,000 in excess of its liabilities. There is no doubt but that during this previous six months' period, the company had been in financial difficulties, but such difficulties did not seem to be incapable of solution. There was no "general inability to meet pecuniary liabilities as they mature by means of available assets *or an honest use of credit.*" The word "meet" as here used is not to be construed as "pay." By an "honest use of credit" the company had been able to "meet pecuniary liabilities" by securing extensions and renewals. The fact that it did so shows that it had credit and the use of that credit in obtaining such extensions and renewals was an "honest use." And in this connection it should be remembered that there was a very substantial equity in the collateral with the Franklin-Washington Trust Company against which no loans were asked for nearly a year prior to April 4th, 1930, and which could have been readily

sold during that period. And the company still had unused credit with other banks. It is plain that an application for a receiver on the ground of insolvency could have been successfully resisted. *A fortiori,* then, should the payments here challenged be approved. *Regina Music Box Co.* v. *F. G. Otto & Sons, supra.*

The accountants selected by the trustees in bankruptcy to examine the books of the bankrupt company have compiled a voluminous financial report, too voluminous for easy analysis, and in it have determined that on April 1st, 1930, this company was insolvent, and a representative of the accounting firm has so testified; but this conclusion is based upon their finding that current liabilities were in excess of current assets, and in view of subsequent results, which I understand to mean results of partial liquidation by the trustees in bankruptcy. But nowhere does the accountant say that there was absolute insolvency on April 1st, 1930. And it is significant that in reporting the condition of the company at various periods as shown by the company's books, there is no date, as of which they report, when the assets do not far exceed the liabilities. On this question they report as follows:

| | | |
|---|---|---|
| Dec. 3, 1929 | Excess of assets over liabilities | $162,203.84 |
| Feb. 28, 1930 | Excess of assets over liabilities | 71,548.72 |
| Apr. 1, 1930 | Excess of assets over liabilities | 303,005.05 |
| June 11, 1930 | Excess of assets over liabilities | 255,590.05 |

Obviously, if the assets were correctly valued on the books of the company there was no insolvency in the popular sense on any of the dates mentioned. That the hotel and theatre properties were correctly valued is not denied. No evidence on this point was offered by the complainants, except to show that *after bankruptcy* the hotel property yielded nothing. That was not a strange result in view of the bankruptcy and the foreclosure proceedings, and is not to be taken as an absolute criterion of value. A clear distinction must be drawn between liquidating values and going concern values. As already stated, these accountants arrive at their conclusion of insolvency on April 1st, 1930, in the light of results, and be-

cause the company's current liabilities exceeded its current assets; but they included in current assets only those assets which they considered readily convertible into cash. They admit that all liabilities are set up, but no credit given for any real estate. Such a method was sure to show insolvency.

Most of the company's assets prior to April 1st, 1930, were tied up in the Hotel Douglas and the Greenwich theatre, the latter being sold at a profit of about $40,000 on that date. The business of the bankrupt company was that of a contractor engaged in general construction work. The Greenwich theatre was built by this company not to operate, but to sell. It was a part of its stock in trade. So, indeed, was the Hotel Douglas. While not originally so, it became such upon the bankruptcy of its promoter. Thereafter it was being built with the expectation of sale at a profit. And it is argued with some force by counsel for the defendants that they should have been included in the current assets; that the nature of the current assets should be determined by the character of the business of the company; that as this company was engaged in the erection and construction of houses and buildings for sale these properties so constructed should be classified as current assets, whereas if they had been owned by a corporation engaged in a mercantile business the accountants would have been justified in classifying them as investments rather than current assets. If these properties had been included in the statement of current assets then the current assets would have far exceeded the current liabilities and the corporation would not have exhibited even a technical insolvency. At April 1st, 1930, all of the company's liabilities were those arising out of the construction of the Hotel Douglas and the Greenwich theatre. The accountants' set up is unfair, to say the least. Either both the properties and the liabilities arising out of them should be "current" or neither should be listed as such.

In *McCormick* v. *E. H. McCormick & Sons, 94 N. J. Eq. 787*, decided by Vice-Chancellor Foster and affirmed by the court of errors and appeals on his opinion, it appears very clearly that the company's real estate should be taken into

consideration in determining the question of solvency or insolvency. In fact, that case is quite analogous to the one now before the court.

As to the claim of the United States Trust Company, in considering the rights of the trustee in bankruptcy to recover the $20,000 paid to that company, it should be borne in mind that at the time this payment was made there was a balance of approximately $25,000 in the bankrupt company's account with that bank, and that the payment check was drawn on this account. Had that check not been drawn and the corporation been declared a bankrupt the next day, these moneys still remaining on deposit, the trust company could, with impunity, have applied the full balance to the credit of the bankrupt company's account to the payment of its note. *Van Wagoner* v. *Paterson Gas Light Co., 23 N. J. Law 283; Butler* v. *Commonwealth Tobacco Co., 74 N. J. Eq. 423; Shields* v. *John Shields Construction Co., 83 N. J. Eq. 21; Rogosin* v. *City Trust Company of Passaic, 107 N. J. Eq. 79,* and this is so even though the notes had not then matured. *Shields* v. *John Shields Construction Co., supra; Leech* v. *Campbell & Duncan, Inc., 103 N. J. Eq. 119;* and had this money remained in the bankrupt's account in this bank until the filing of the petition in bankruptcy on June 11th, 1930, the result would have been the same. The money not having been paid pursuant to an attempt at an unlawful preference, there being neither actual fraud nor charge of such fraud, the design of the legislation being to prevent fraud and not to hamper honest endeavor, the court should be keen to find some means to sustain its legality. And as to the payment to the Clifford F. MacEvoy Company, the $4,500 loaned by that company was used to pay current liabilities thereby *pro tanto* reduced. It was a temporary loan and no inequity appears from its repayment.

In view of what I have said it becomes unnecessary to pass upon the further defense of "set-off" pleaded by the United States Trust Company in its amended answer.

The bills will be dismissed.