IRVING SOLOMON, receiver of ATLANTIC IMPORTING COMPANY, INCORPORATED, complainant,

*v.*

AMERVOLL COMPANY, INCORPORATED, a corporation, defendant.

[Decided December 16th, 1935.]

*Mr. Irving Solomon (Mr. Isadore Glauberman, of counsel), pro se.*

*Mr. Harry Kaiser (Mr. Ralph H. Jacobson, of counsel), for the defendant.*

EGAN, V. C.

The receiver herein seeks to set aside a transfer of two hundred and fifty-six cases of wine, made to the defendant company on or about April 6th, 1935, and for an accounting from the defendant of any sales made by it of that merchandise. The receiver of the company was appointed by an order of this court on April 22d, 1935. He alleges that on or about April 6th, 1935, a consignment of two hundred and fifty-six cases of wine, valued at $1,128, property of the insolvent company, the Atlantic Importing Company, Incorporated, was delivered to the defendant company, and that the said defendant, without warrant or authority, paid on account thereof to Rohner-Gehrig & Company, Incorporated, custom brokers, a creditor of the Atlantic Importing Company, Incorporated, the sum of $1,191.47. It is alleged that at the time of the payment, the Atlantic Importing Company was insol-

vent and was in no financial position to pay the amount it owed to Rohner-Gehrig & Company, and that this was known to the defendant. The former president of the Atlantic Importing Company, Salvatore Inzinna, testified that he or no officer of the company authorized the payment by the Amervoll Company to Rohner-Gehrig & Company. He said he had a conversation with Mr. Golden, the president of the defendant company, and one of its salesmen, a man named Stern, who took part in the negotiations, which it was calculated, would impute to the defendant some knowledge of the financial condition of the Atlantic Importing Company at the time of the transaction. But Golden testified that he had examined a Dun & Bradstreet report of the Atlantic Importing Company dated December 28th, 1934, which showed a sound financial condition of the Atlantic Importing Company, Incorporated, as of, or about, October 20th, 1934; and on cross-examination, he stated they were solvent by a very low margin. Inzinna said that at the time of his conversation, as above indicated, it was with both Stern and Golden together, and that Golden then said "we weren't good for credit." This alleged conversation took place approximately one and a half months previous to the order of insolvency, or sometime in the month of March, 1935. The defendant denies that it knew of the Atlantic Importing Company's insolvency. I was not impressed by Inzinna's attitude. He was not convincing.

It appears that the Rohner-Gehrig Company were handling the sales of the Atlantic Importing Company since December or November of 1934; that the importing company was indebted to the Harborside Warehouse, located in Jersey City, for storage charges; the importing company owed the Rohner-Gehrig Company money advanced by it for duties and storage on a shipment of wines, of which the two hundred and fifty-six cases formed a part.

Rudolph O. Haller, vice-president of the Rohner-Gehrig Company, testified, in effect, that in the early part of April, 1935, Inzinna and a man named Sampson, whose father had shipped a consignment of wines, which included the two hundred and fifty-six cases, from Germany to the Atlantic

Importing Company, came to him in his office and stated that they (the Atlantic Importing Company) would like to have a release of two hundred and fifty-six cases of wine from the warehouse, and he requested Haller to have his company advance the storage charges, and the duties imposed on the merchandise, for which they would entrust Rohner-Gehrig & Company with the collection of their invoice to the customers. A day or two later, or approximately April 4th, Inzinna and Sampson told Haller that they were negotiating a deal with the Amervoll company for a part of the merchandise, and they requested him to have his company pay the storage charges so that a transfer could be effected. Haller stated that he would consent to the arrangement if the payment would be made to him for his company, since he had already advanced the moneys on account of the duties that were imposed on the merchandise, which amounted to approximately five or six hundred dollars. On or about April 8th, Sampson called on Haller and handed him a letter from the defendant company and a check for $1,103 for the two hundred and fifty-six cases of wine sold in bond to the defendant company. Haller paid the warehouse charges on the two hundred and fifty-six cases and obtained a receipt in Amervoll's name and he also procured the customs transfer papers to effect a transfer of the consignment. Haller stated that he had a power of attorney from the Atlantic Importing Company to sign customs papers, and he signed all papers that were necessary to transfer the two hundred and fifty-six cases. Sampson, who handed the letter and check from Amervoll to Haller, was an employe of the Atlantic Importing Company.

At the time the transaction was effected, there was no actual suspension of business. Section 64 of the General Corporation act provides:

"Whenever any corporation shall become insolvent or shall suspend its ordinary business for want of funds to carry on the same, neither the directors nor any officer or agent of the corporation shall sell, convey, assign or transfer any of its estates, effects, choses in action, goods, chattels, rights or credits, lands or tenements; nor shall they or either of them make any such sale, conveyance, assignment or transfer in contemplation of insolvency, and every such sale, conveyance, assignment or transfer shall be utterly null and void as against

creditors; provided, that a *bona fide* purchase for a valuable consideration, before the corporation shall have actually suspended its ordinary business, by any person without notice of such insolvency or of the sale being made in contemplation of insolvency shall not be invalidated or impeached."

*Hoover Steel Ball Co.* v. *Schafer Ball Bearings Co., 89 N. J. Eq. 433; 105 Atl. Rep. 500.*

The evidence does not show that the defendant company had knowledge of the insolvency of the Atlantic Importing Company. *Agnew* v. *Board of Education, 83 N. J. Eq. 49; 89 Atl. Rep. 1046; Regina* v. *Otto, 65 N. J. Eq. 582; 56 Atl. Rep. 715.*

It was held in *Glauberman* v. *Bergenline, 108 N. J. Eq. 531; 155 Atl. Rep. 715,* that:

"A payment made by a corporation of one of its unmatured debts, about a week before its being adjudicated insolvent, will not be held to have been made in violation of the statute, in the absence of proof that, at the time of its making, the corporation had suspended its ordinary business for want of funds to carry same on, or was insolvent or had made same in contemplation of insolvency."

In *Long* v. *Republic, 115 N. J. Eq. 212; 169 Atl. Rep. 860,* it was held:

"Payment to an ordinary creditor, without notice of insolvency, received while the company is carrying on its usual business, does not fall within the condemnation of section 64 of the General Corporation act. Were the rule otherwise, no creditor could safely accept payment of any ordinary debt unless he had first ascertained that the corporation was solvent."

See *Hoagland* v. *United States Trust, 110 N. J. Eq. 489; 160 Atl. Rep. 662.*

In *Hersh* v. *Levinson, 117 N. J. Eq. 131; 174 Atl. Rep. 736,* Mr. Justice Heher, speaking for the court of errors and appeals, goes quite extensively into the rights of creditors and debtors under section 64 of the General Corporation act, and the principles there learnedly discussed by him have a bearing on the instant case.

Under all the circumstances, I feel the defendant company is entitled to a decree.