Fort Wayne Electric Corporation v. Franklin Electric Light Co.

## FORT WAYNE ELECTRIC CORPORATION

### v.

## FRANKLIN ELECTRIC LIGHT COMPANY.

[Filed September 13th, 1898.]

1. Upon proper application, where the proofs clearly exhibit that a corporation is insolvent and that there is no reasonable prospect that, if let alone, it will soon become safely solvent, a receiver will be appointed.

2. The requirement of the statute that proof shall be made that an insolvent corporation will not be able to "*resume*" its business with safety to the public and advantage to its stockholders within a short time does not predicate a complete suspension of business before a receiver can be appointed, but the taking up again and performing such functions or duties as shall have been suspended because of the insolvency, such as the payment of its current obligations.

On bill for a receiver, answer and proofs.

*Mr. David J. Pancoast*, for the complainant.

*Mr. Samuel H. Grey* and *Mr. Robert H. McCarter*, for the defendant.

THE CHANCELLOR.

The complainant recovered judgment against the defendant on the 15th of January, 1898, for $12,443.04, and, as a creditor of that company, asks that it be adjudged to be insolvent and that a receiver be appointed for it. In March, 1898, it made similar application, which was determined by decree dismissing its bill, dated on the 9th of June, 1898, upon the opinion and advice of Vice-Chancellor Reed, filed May 28th, 1898. The present bill was filed June 27th, 1898, eighteen days after the dismissal decree was made and about a month after the opinion in the former suit was filed.

Upon the previous application, as upon the present, it was made to appear that the defendant was engaged in the business of electric lighting at Cape May, where it has a contract for lighting the public streets and places extending some four years into the future; that it then had a completed plant consisting not only of the boilers, engines, dynamos and other apparatus appropriate thereto, but also poles and wires throughout the highways and country adjoining it; that upon the plant something approximating $60,000 had been expended; that a large part of the machinery had been erected upon the land of one William O. Robb, who held a mortgage upon it and also a mortgage upon lands belonging to the light company, together securing to him the payment of $13,500; that a judgment had been recovered against the company in April, 1892, for about $1,200, in favor of Russell & Company, which antedates the mortgages, but is said by the defendant to have been paid, but is not satisfied of record; that, subsequent to the mortgages, in June, 1896, one Warren recovered two judgments against the company, aggregating about $1,650, which appear to have been purchased for Thomas Robb, who has caused executions to be issued and levies made, so that he may sell the properties levied

upon at pleasure; that in December, 1897, one Tunis recovered a judgment against the company for about $2,100, upon which execution issued and levy was made, and in February, 1898, the complainant recovered judgment against the company for about $12,500.  It did not then appear what the value of the defendant's property was nor that it was not worth all that had been expended upon it, and, by reason of its contract with the municipality and entry upon the actual use of its franchises, perhaps more than that sum.  In absence of such proof, Vice-Chancellor Reed thought, that, while technical insolvency was exhibited by proof of a mortgage under foreclosure, unpaid judgments under which levies had been made and the existence of taxes and unsecured indebtedness unsatisfied, which the defendant could not pay, yet it was not a case for the appointment of a receiver, because the attitude of the creditors, except the complainant, indicated a forbearance that would admit of the continuance of the operation of the plant by the defendant and the execution of a then proposed scheme, which appeared to the vice-chancellor to be feasible, to retire the entire outstanding indebtedness by the issue of bonds, and because it did not appear that advantage could result to either the creditors or the stockholders of the company in the appointment of a receiver.

Upon the present application the opinion of a witness is offered to show that the value of the defendant's property is not equal to the amount of the levies upon it, exclusive of the complainant's judgment.  If this opinion should be held to establish the value, a doubtful proposition with reference to so special a property, the matter is not new.  The proof shows that the same conditions upon which the opinion is based existed at the time of the former litigation.  The same proof might have been offered on the former suit.  A new case cannot be made out of omitted facts then available.

The material fact urged upon this application, that has come into existence since the case was adjudicated, is charged in the bill to be that the defendant

"has arranged a fraudulent sale of all its property of every sort, including its franchises, to the said William Oscar Robb for the pretended sum of fifteen hundred dollars above his said mortgage claims against the company."

This allegation offers a very material fact upon the inquiry whether a receiver should be appointed. The vice-chancellor's conclusion was based upon his confidence in the integrity of the real managers of the company and their fidelity to the interest of the company's creditors. He believed that their purpose was, as they represented it to him, to execute a scheme to issue bonds to liquidate the outstanding indebtedness of the defendant, and that the affairs of the company were being managed with economy and in the interest of creditors. If it had appeared to him that the purpose of those managers was, by a secret and contrived sale, for an inadequate price, to completely cut off and defeat the claims of creditors and stockholders, the case he considered would have presented an entirely different aspect.

By its answer the defendant denies, using its language,

"that it has any purpose or expectation of selling or disposing of its property, including its franchises, for the pretended sum of fifteen hundred dollars above the claims of the said Robb against this defendant or for any other sum,"

but at the same time admits that at an informal meeting of three out of the five directors of the defendant, of which meeting no notice to the absent directors had been given, discussion as to the advisability of making some disposition of the defendant's property for the purpose of raising cash to pay *all* its indebtedness arose, but the suggestion was abandoned.

The answer in this respect is supported by the *ex parte* affidavit of Logan M. Bullitt, the president and a director of the defendant, in almost the terms of the answer and without further particulars. That charge of the bill is sought to be sustained, upon the other side, by the testimony of James E. Taylor and James M. E. Hildreth, two directors of the defendant. Mr. Taylor testified that there are five directors of the company—Messrs. Hildreth, Melvin and himself, of Cape May, and Messrs. Bullitt and Wilson, of Pennsylvania, the latter of whom is an employe of Mr. Bullitt; that the books of the defendant are kept in the office of Mr. Bullitt, at Philadelphia, and all receipts of moneys are sent to Mr. Bullitt there; that Wilson is the secretary and treasurer of the company, and that he (Taylor) has

Fort Wayne Electric Corporation *v.* Franklin Electric Light Co.

no information or knowledge as to what is done with the funds received for the company. He further testifies that in June, 1898, after the determination of the cause before Vice-Chancellor Reed, a meeting of directors was held at Cape May, at the house of Mr. Hildreth, at which Mr. Bullitt proposed to sell the right, title and interest of the defendant, including its franchises, to William O. Robb for $1,500. The proposition was opposed by Mr. Hildreth, but, after discussion, Mr. Bullitt said that he would consider Mr. Wilson present and in favor of it and that the resolution had passed, and boasted that "*they*" had refrained from paying interest on the mortgages and were going to foreclose them; that they had control of the judgments and "when they got these things all working together somebody would be cleaned out." Mr. Hildreth testifies that the meeting of directors, in June, 1898, was the first that had been held in two years, during which time Bullitt had sole control of the company; that Bullitt stated that the object of the meeting was to sell the defendant's property and franchises to Mr. Robb for $1,500, "subject to what there was against it;" that the witness opposed it as a fraud upon the general creditors; that Bullitt declared it carried, but that subsequently the witness understood that the whole matter had been dropped. Mr. Melvin says that he was notified of the meeting referred to, by telephone, but was unable to attend it, and that he knows nothing of the affairs of the company since Mr. Bullitt has assumed charge of them.

Objection was made to this proof of corporate action upon the contention that the minute-book is the best evidence of it. If the only object of the proof was to show corporate action this would be true, but in this inquiry the disposition of the actual management of the company towards creditors and stockholders is in question, and that is best shown by the acts and utterances of the several members of that management.

This reference to the books itself suggests the pertinent fact that Mr. Wilson had due notice that the books would be required at the taking of proofs, both by notice and by *subpœna duces tecum* served upon him in Philadelphia, and not only that but that the defendant, by order of this court, was required to bring

the books within the state for use upon this inquiry, yet they were not forthcoming. Mr. Bullitt is not shown to have been served with such papers. He was in the South and did not return until just prior to the examination of witnesses, but it is in evidence that he knew that the books were needed. The other directors were notified in a similar way, but had no control over the books. The withholding of the books is a circumstance in this consideration.

The testimony of Messrs. Taylor and Hildreth is not denied. I think that the proofs clearly establish that, upon the part of Mr. Bullitt, the scheme of bonding to liquidate indebtedness, if it ever really existed, has been abandoned, and that, instead, a strong disposition now exists to avoid the payment of a part, at least, of the unsecured creditors and to sacrifice the interest of some of the stockholders, but I do not think that either the meeting in June was lawfully called or that the resolution offered by Mr. Bullitt was adopted. Mr. Hildreth voted against the resolution and Mr. Taylor remained silent. Mr. Bullitt could not alone pass it. Besides, it contemplated a virtual surrender of the business in which the stockholders of the company had ventured their capital without reference to their will.

Before the court can appoint a receiver for this corporation it must appear, first, that the corporation is insolvent, and second, that it will not be able to resume its business with safety to the public and advantage to its stockholders within a short time.

It is a contention of counsel that the second requirement of the statute defines the insolvency intended as one that shall include a suspension of the business, while in the case before me, though there be insolvency, the business of the company has not suspended, the electric lighting continues and receipts therefor come into the treasury. I agree that the word "resume," as used in the statute, predicates some interruption of the insolvent's business, but I do not understand that it contemplates an entire suspension of all its workings. Such has not been the practical interpretation the bar and the courts have given it, for manufacturing and other companies with plants in operation have constantly been adjudged to be insolvent and put in the

hands of receivers, and in so doing large values have been saved to creditors and stockholders because of the salable condition of a live plant as compared with one that is dead. Insolvency carries with it inability to presently pay indebtedness and suspension of that function, and the word " resume," used in the statute, is, I think, to be taken in the sense of taking up again that suspended function, so that payment of indebtedness, as well as the operation of the work of the corporation, after temporary, partial or complete paralysis, may be " resumed " with safety to the public and advantage to its stockholders.

This point was not involved in *Cook* v. *East Trenton Pottery Co., 8 Dick. Ch. Rep. 29,* and I do not understand that that case, even in *dictum,* holds the contrary of the view I have expressed.

That the late Vice-Chancellor Van Fleet understood the statute in the way I have interpreted it, I think is manifest in his course of thought in *Atlantic Trust Co.* v. *Consolidated Electric Storage Co., 4 Dick. Ch. Rep. 402, 407,* where he suggests an admirable guide in the appointment of receivers for insolvent corporations. He says : " The principle which I think should control the court in the exercise of this power is this—never to appoint a receiver unless· the proof of insolvency is clear and satisfactory and unless it also appears that there is no reasonable prospect that the corporation, if let alone, will soon be placed, by the efforts of its managers, in a condition of solvency. To illustrate : Where the corporation attacked is shown to be insolvent, but it also appears that its managers are honest and capable and that they are striving, to the best of their ability, with fair prospect of success, to relieve the corporation from its embarrassment and to put it in a condition where it may prosecute its business successfully, and the property of the corporation is free from judgment or other lien under which it may be sold speedily, at a sacrifice, the court should not interfere."

In the present case the corporation is encumbered by mortgage under foreclosure and by judgments and levies is prepared for immediate sale. Its actual management is in the hands of a minority of its directors. The receipts from its business are habitually taken from the state and are unaccounted for to its

directors.  No effort is being made to relieve the company from its perilous condition.  On the contrary, at the single but irregular meeting of directors, held in two years, an effort was made to virtually abandon the corporation.

I think that a receiver should be appointed.  It may be doubtful whether he can accomplish much for the relief of stockholders, but there appears to be a possibility that creditors may be paid through his instrumentality.