HENRY W. CATLIN et al.

*v.*

VICHACHI MINING COMPANY.

[Submitted May 28th, 1907. Decided June 4th, 1907.]

1. Where a corporation is losing money in the carrying on of its business, and is seriously embarrassed for want of funds to carry out the project for which it was organized, and is without available assets to pay its present indebtedness, notwithstanding there may not have been a complete suspension of its business, it is insolvent within the meaning of the Corporation act of 1896 (*P. L. 1896 p. 298 ch. 185 § 65*), providing that when any corporation shall become insolvent, or suspend its ordinary business for want of funds to carry on the same, any creditor may apply to the court for an injunction and the appointment of a receiver, and that, if upon the hearing it shall appear that the corporation has become insolvent and is not about to resume its business, the injunction may issue and the receiver be appointed, and hence is subject to the issuance of an injunction and the appointment of a receiver.

2. That creditors of an insolvent corporation may have instituted the proceedings for the appointment of a receiver authorized by the Corporation act of 1896 (*P. L. 1896 p. 298 ch. 185 § 65*), with the ulterior purpose of securing control of the affairs of the corporation, will not defeat the same.

On bill to wind up the affairs of a corporation and motion for injunction and receiver.

*Mr. Edward A. Day,* for the motion.

*Mr. Arthur A. Bissell, contra.*

HOWELL, V. C.

The bill in this case is filed by several persons claiming to be respectively stockholders and creditors of the Vichachi Mining Company, alleging insolvency of the company and praying for the appointment of a receiver to wind up its affairs. Although other relief is prayed, the bill is the ordinary bill for the administration of the affairs of an insolvent corporation. The usual order to show cause why an injunction should not issue and a receiver be appointed was made, and upon its return defendant appeared and filed affidavits, the object and purpose of which was to deny the allegations of insolvency in the bill.

The case then proceeded to a hearing in a summary way on the affidavits, proofs and allegations offered on behalf of both parties, in accordance with the practice laid down in *Pierce* v. *Old Dominion Co., 67 N. J. Eq. (1 Robb.) 399,* the question at issue being whether the corporation was insolvent within the meaning of the sixty-fifth section of the Corporation act of 1896.

The corporation was organized under the General Corporation law of New Jersey, in the year 1904, and shortly after its organization it became the owner of a mining property in the State of Oaxaca, in the Republic of Mexico; it has been engaged for three years or thereabouts in developing the property and has spent therein about $40,000. Its debts and obligations, including the annual franchise tax, which is presently to become due, amount to about $8,000; its assets are the mining property itself, concerning the value of which there is little or no evi-

dence; cash, $1,200; building, $3,000; machinery, $3,000; wood, $450; stock of tools, steel, &c., $1,000. In addition thereto there are some piles of ore which have been taken from the mine, mention of which will be made further on. There is also a claim for $1,500, Mexican, or $750 gold, against the complainant Catlin, which is disputed and seems to be of doubtful validity.

As I have stated, there was no evidence on the part of either complainants or defendant as to the value of the mining property itself. This I cannot help thinking is a very serious omission on the part of the defendant, and it can only be explained upon the theory that in its present condition of development it has little or no value. Indeed, the evidence on both sides was to the effect that it would require an expenditure of from $25,000 to $30,000 to put it upon any sort of a paying basis.

As to the piles of ore "on the dumps," as they were described, which were represented on the part of the defendant to be of the value of upwards of $22,000, gold, we have the testimony of a mining engineer, who is also one of the complainants, to the effect that in their present situation, counting the distance from milling and smelting works and incidental expenses, these piles have little or no value. The buildings are constructed of adobe bricks and cannot be moved. Originally they are said to have cost $12,000. It is quite evident that unless the use of the mine continues these buildings are of little or no value.

In my opinion it therefore appears that on a fair collation of the assets and liabilities the corporation is not in a condition to meet its ordinary accruing liabilities, and that in case its operations shall be stopped and its affairs wound up it could pay only a fraction of its debts.

On the other hand the indebtedness of the corporation is of the most pressing character. There is first a call loan, made by Rickards and Elliot, aggregating $5,000, gold. Mr. Elliot, one of the creditors, admitted on the stand that it would not be for his interest as a creditor to call this loan, the natural inference being that it would be injurious to the company. The company's ordinary current monthly accounts are from $100 to $150; the salary of the superintendent remains unpaid to the extent of

$850, and lastly, a judgment was recovered against the company in the Hudson county circuit court, on April 12th, 1907, in favor of the complainant Hamilton, for upwards of $1,400, on which execution has been issued, which the bill alleges is unsatisfied and is about to be so returned by the sheriff of Hudson county. It was admitted on the argument by counsel for the defendant that the corporation owned no property in New Jersey.

The management, appreciating the perilous condition in which the property is, some time in February or March, 1907, projected a scheme for raising $30,000 by mortgaging the Mexican property to secure issue of bonds of that amount. In the circular that was sent to the stockholders, under date of April 8th, 1907, the treasurer stated the immediate necessity for $25,000 in gold, at once, to meet present indebtedness and needed development, and stated that the company was at that time losing or would lose $100 a week in what he called the "extra development" of the mine. The meeting of the stockholders which was called for the purpose of considering the proposition to mortgage the property was stopped by injunction in this suit and the project has not proceeded any further.

The management at the hearing admitted the inadvisability of attempting to mortgage the property as was thus proposed. They had then in mind a substitute plan, viz., the making of the company's unsecured notes to the aggregate amount of $30,000, payable in five years, drawing six per cent. interest, which they hoped to sell to the present shareholders at ninety per cent. of their face value, thus producing $27,000, but no arrangements have been made with the stockholders to take these notes, and it is quite evident that the complainants, who are nineteen per cent. and who represent thirty per cent. of all the body of the shareholders, will not aid in this scheme because they think that the corporation is now insolvent. It must be manifest that a corporation on the eve of insolvency, to take the most charitable view of the situation, could not float a note issue of this character.

There remain in the treasury a few shares of stock, which the management attempted to sell to the present shareholders, and concerning which the president sent out a circular dated March

18th, 1907, in which he says less than one-third of the stockholders have complied with the request for a subscription of two per cent. on their stock, but eight have sent money to date. This indicates an indisposition on the part of the shareholders to put any more money into the enterprise.

Under date of April 8th, the president sent out a circular in which he said:

"The mine is carrying itself to a very small extent, really running behind about one hundred dollars a week if we do any extra development work. We must have at least twenty thousand dollars gold at once, beside paying back the loan and some bills amounting to about five thousand dollars more, that or quit. The details are being worked out, and suggestion will be submitted when the proxies are sent out."

If this statement is true, and the testimony adduced at the hearing seems to support it, there can be no question but that the affairs of the corporation are in a very precarious condition.

The corporation is still running its business. It has not suspended the same for want of funds, and it was argued that inasmuch as this condition did not exist there could be no adjudication of insolvency or appointment of a receiver. I think the defendant's argument is not sound. A corporation may be insolvent and yet not have suspended its business for want of funds to carry on the same. It likewise may have suspended its business for want of funds and still be able to pay its debts if properly wound up. If either fact, insolvency or suspension exists without the other, the court may entertain the bill and proceed in a summary way to hear the affidavits, proofs and allegations which may be offered on behalf of the parties. The inquiry then goes to the questions "insolvency" and "resumption," and the query is, what is meant by resumption in the second part of the section under which this action is taken. The query is fully answered by Chancellor McGill in *Fort Wayne Electric Corporation* v. *Franklin Electric Light Co., 57 N. J. Eq. (12 Dick.) 7.* It is here contended, as it was in that case, that the second requirement of the section defines insolvency so broadly as to necessarily include a suspension of business, because principally of the conjunctive construction of the sentence, and that inasmuch as the company had not entirely supended its business the word "re-

sumption" puts this case out of the statute. The plain, logical and satisfactory interpretation of the language of the section given by Chancellor McGill, in the case just cited, makes it include the very situation disclosed by the testimony at bar. He says: "I agree that the word 'resume' as used in the statute, predicates some interruption of the insolvent's business, but I do not understand that it contemplates an entire suspension of all its workings. Such has been the practical interpretation the bar and the courts have given it for manufacturing and other companies with plants in operation, have constantly been adjudged to be insolvent and put in the hands of receivers, and in so doing large values have been saved to creditors and stockholders because of the salable condition of a live plant as compared with one that is dead. Insolvency carries with it inability to presently pay indebtedness and suspension of that function, and the word 'resume,' used in the statute, is, I think, to be taken in the sense of taking up again that suspended function, so that payment of indebtedness as well as the operation of the work of the corporation, after temporary, partial or complete paralysis, may be resumed with safety to the public and advantage to its stockholders."

The facts resemble quite closely those adduced in *Reinhardt* v. *Interstate Telephone Co., 71 N. J. Eq. (1 Buch.) 70*, in the opinion in which Vice-Chancellor Pitney says: "Of late years numerous corporations have been adjudged insolvent and receivers appointed therefor without any interruption of their business and before any debt has actually matured without payment, on proof merely that the corporation would be unable to meet its immediately maturing obligations, and that a scramble would ensue among its creditors, resulting in inequality of distribution of its assets. It is common practice to declare railroad, gas and water companies, and other public service corporations, insolvent and appoint a receiver without the least interruption of their public functions."

The court of errors and appeals has defined the condition of insolvency contemplated by our statute. In construing section 64, which contains the same phrase as is contained in the first portion of section 65, "Whenever any corporation shall become

insolvent or shall suspend its ordinary business for want of funds to carry on the same," Mr. Justice Dixon says, in *Empire State Trust Co.* v. *Fisher,* 67 *N. J. Eq.* (*1 Robb.*) 602: "Insolvency denotes a general inability to meet pecuniary liabilities as they mature by means of available assets or an honest use of credit."

Applying these definitions to the case in hand, we find (1) a going business which is losing money by its operation; (2) that it is seriously embarrassed for want of funds to carry out the project for which the corporation was organized; (3) a call loan, which the company has no means of satisfying; (4) an unsatisfied judgment pressing for payment, which it does not have sufficient funds to meet; (5) an admission of its perilous condition contained in the scheme for financing and continuing the company's operations; (6) an inability to convert its assets into cash, and, indeed, according to the defendant's own showing, a total lack of available assets with which to carry on the business and pay its present debts.

These circumstances convince me that the company is brought directly within the section of the statute referred to, and that it is insolvent, and its affairs should be wound up by a receiver. It was argued that the case showed that the litigation was merely an attempt on the part of the complainants to obtain control of the company's affairs. I do not think this appears in the case, nor do I see how nineteen per cent. or even thirty per cent. of the shareholders could control the remainder; but suppose the fact existed that the complainants were acting from ulterior motives, this would be no defence. *Fort Wayne Electric Corporation* v. *Franklin Electric Light Co., 57 N. J. Eq.* (*12 Dick.*) *16, 20.*