RAYMOND B. STILES, administrator of the estate of Emma L. Newschwander, deceased, complainant-appellant,

*v.*

ALBERT NEWSCHWANDER and GRACE E. NEWSCHWANDER, defendants-respondents.

[Argued May 23d, 1947. Decided September 12th, 1947.]

*Messrs. Stickel & Stickel* (*Mr. Fred G. Stickel, Jr.,* and *Mr. Harold M. Kain,* of counsel), for the appellant.

*Mr. Louis H. Hollander* and *Mr. Harold N. Gast,* for the respondents.

The opinion of the court was delivered by

HEHER, J.

The matter here in controversy is the title to a fund on deposit in a savings bank of Newark. The account was originally in the name of appellant's decedent, Emma L. Newschwander; and all the moneys deposited therein were her property. On December 1st, 1941, she made application to the bank to "add the name" of her brother Albert, with whom she had her abode, "to my account * * *, making same payable to either or survivor;" and the request was granted. On September 26th, 1944, she suffered a cerebral hemorrhage; and she died on the ensuing February 5th. On the day of the cerebral stroke, Albert had the entire de-

posit, then in excess of $3,500, transferred to his name alone; and five weeks later he had his wife's name added to the account.

The critical inquiry is whether the decedent, by the addition of her brother's name to the account, intended a gift to him *in præsenti* of an interest in the fund. The learned Vice-Chancellor found such an intent, and therefore a valid gift *inter vivos*. We take a different view.

Neither the form nor the content of the account is, in itself, conclusive of the issue of title and ownership. Such interest (if any) as the survivor has in the deposit derives from a gift *inter vivos* and not from a contract between the co-depositors *inter se;* and a gift, in turn, derives its legal efficacy solely from the intention of the donor. A donative purpose is an indispensable requisite. And a valid gift *inter vivos* goes into immediate and absolute effect. If the design of the deceased transferor was not an immediately effective gift, but a transfer merely for convenience of withdrawal, with retention in herself of full ownership and absolute dominion over the deposit until her death, Albert to take the balance of the fund in the event of his survival, without any present interest in the deposit, there was not a gift *in præsenti;* and the gift in case of survival, *i. e.,* to take effect upon the death of the transferor, would be testamentary in character and void for non-conformance with the statute of wills. A gift of a bank deposit in terms either of common ownership or of joint tenancy is but *prima facie* evidence of an intention to make a gift *in præsenti;* and the writing succumbs to proof in quality sufficient to overcome that presumption. These are the principles pertinent here. *Rush* v. *Rush, 138 N. J. Eq. 611.*

The learned Vice-Chancellor deduced that the deceased transferor and her brother Albert "both intended that during her lifetime he should draw upon the fund only for her convenience and benefit, and that he should have for his own use whatever might remain in the account at her death;" but he also concluded that the decedent designed a gift *in præsenti,* with "Albert's title *  *.  * burdened with a trust in favor of his sister so long as they both lived." He per-

ceived no evidence of this intent except in the frame of the account. He reasoned thus: "In the instant case, there is no satisfactory evidence except the form of the account itself by which to determine whether" the decedent "had the one intention or the other. Likely, she did not consider the subject. In the absence of proof to the contrary, the form of the account governs, for it shows not only what was done, but presumably what was intended. An account in two names, payable to either one or to the survivor, evidences a gift to take effect *in præsenti*." And therein he fell into error. Although finding that in all likelihood the decedent "did not consider the subject" of whether to vest in Albert a beneficial interest in the deposit *in præsenti* or *in futuro* merely, *i. e.,* upon her death, the Vice-Chancellor nevertheless held that the shape of the account betokened an intention to make a gift *in præsenti,* and that intention must therefore be effectuated. Thus, the form of the deposit was made a substitute for an intention that did not exist in fact. If the decedent "did not consider the subject" of a gift *in præsenti,* it goes without saying that she could not have had an intention to make such a gift. Intention is a matter of fact, not of formula. The form of the account may raise a rebuttable presumption either of a joint tenancy or of common ownership, indicating an intention to transfer a present beneficial interest to the donee, but it is not a substitute for the intention itself. If there was in fact no intention to transfer an interest *in præsenti,* there was not a gift *inter vivos.* If, in the absence of evidence *contra,* the presumptive inference of an intention to make a gift presently effective is drawn from the frame of the deposit, it is one thing; but where the evidence affirmatively shows a contrary intention or no intention at all, one of the essential requisites of a gift *inter vivos* is wanting.

Neither *R. S. 17:9–5* nor *17:9–5.1* gives rise to a conclusive presumption of a gift of a present beneficial interest in the deposit, with the right of survivorship that is an incident of a joint tenancy, where words of joint tenancy or joint ownership are used in the creation of the account. The section first cited lays down a rule of evidence rather than of

substantive law. Words of joint tenancy or of common owner-ship merely constitute presumptive evidence of an interest by survivorship which stands until overthrown by proof *contra.* And the second section, applying to savings banks, has reference only to the protection of the bank in the pay-ment of the fund to either of the co-depositors, even though the other be dead. *Rush* v. *Rush, supra.*

Thus, the form of the account here is but *prima facie* evidence of an intention to make a gift *in præsenti;* and we find that the presumption has been rebutted by the proofs. There was no donative intent. There is no basis whatever for the Vice-Chancellor's finding that the decedent designed to transfer to Albert a present joint title to the account, "bur-dened with a trust in favor of his sister so long as they both lived." Albert's name was added to the account for con-venience of withdrawal merely, and not to vest in him a beneficial interest in the fund. The decedent was then 68 years of age, and in ill health. She was afflicted with myo-carditis and arteriosclerosis, and she had just had a throm-bosis. Her physical condition was such that she could not "safely" journey to the bank; and, besides, walking caused "much pain" and aggravated her ailments. She was "wor-ried" and "nervous" and "terribly upset;" and her physician (whose credibility is not impeached) advised her to designate one of her brothers as her "agent" to "take care of her [bank] account" and "look after her financial affairs." The phy-sician was quite insistent on this course as a necessary health measure. The decedent first asked her brother Charles to act in this capacity, but he declined for fear of "criticism." He suggested that Albert be asked to serve, but she demurred. She then requested her sister Kittie to undertake the task, but Kittie proposed Albert as a more convenient representa-tive because decedent lived with him. The physician's advice was given on October 25th, 1941; and the name of Albert was added to the account on the ensuing December 1st. Thereafter, both the decedent and Albert treated the deposit as her exclusive property. All the withdrawals were made by her or on her behalf until Albert caused the account to be transferred to his name alone, immediately after she suf-

fered the cerebral stroke; and Albert made no deposits of his own money therein. The fund constituted almost the whole of decedent's estate. Her remaining property consisted of life insurance amounting to a little in excess of $600, which was used to defray, in part, the cost of hospitalization during her last illness and funeral expenses.

This testimony of the attending physician and Charles and Kittie is consistent and entirely reasonable and credible; and thus the self-interest of the kinsmen does not reasonably afford the basis for a discrediting inference. It illustrates and gives character to the decedent's subsequent act giving rise to the joint account; it is revelatory of the motive and intent. The declarations after the event are of questionable competency. Perhaps, because of the peculiar nature of joint bank deposits, their admission into evidence is sustainable on principle. Unlike other transactions taking the form of a gift, the act of placing the name of another on one's bank account is not unequivocal as respects the intention. But we have no occasion to consider the question. These declarations tended to show only a gift *in futuro* testamentary in character, and therefore unenforceable.

And, as was the case in *Rush* v. *Rush, supra,* Albert's conduct is altogether inconsistent with his present claim of ownership of the deposit. It betrays an awareness that there was no intention to make a gift *in præsenti*. As we have seen, he caused the fund to be transferred to himself alone immediately after his sister had the cerebral seizure; and five weeks thereafter, while his sister yet lived, he caused his wife's name to be added to the account. He said this was done to avoid inheritance taxes. Even so, the act does not serve to inspire confidence in his testimonial integrity. But is not avarice a much more likely hypothesis? Two weeks after his sister's death, Albert wrote to Charles promising an "accounting" in two months, and the promise was reiterated in subsequent letters; but he finally informed Charles that "Grace [Albert's wife] has decided to keep that money and I am going to stand by Grace," and that he (Albert) "was entitled to the money for what" he "had done for" his "sister for 31 long years."

The Vice-Chancellor palliates Albert's transfer of the fund to his name alone, and thereafter to himself and his wife jointly, while his sister still lived, as in no sense a breach of duty, but a transfer in trust for his stricken sister during her lifetime, which trust he had not violated, and so he did not lose the right of survivorship on the theory of a transformation of the account into an estate in common. But it was plainly an appropriation of the exclusive title to the deposit during his sister's lifetime, and thus a deprivation of her title and the use of the moneys before her death; and its significance lies in what would seem to be the implicit recognition thereby of a want of title and a determination to acquire the fund irrespective of title. The transfer of the deposit was a radical measure that would not have been invoked, we are quite convinced, if Albert had a sense of security grounded in the knowledge of an intention on the part of his sister to vest in him a beneficial interest in the fund; certainly, he cannot complain if his conduct in this regard, indefensible on his own version of the transaction, be so interpreted. One's behavior is ordinarily more revealing as to state of mind than one's words. After the issue is made comes the rationalization.

In the circumstances, a holding that, by the addition of her brother's name to the account, the decedent intended to transfer to him a present beneficial interest in the fund would be utterly opposed to reason and logic. The form of the deposit loses meaning in this regard in the light of all the facts and circumstances.

The decree is accordingly reversed, with costs; and the cause is remanded for further proceedings in conformity with this opinion.

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, BODINE, DONGES, HEHER, COLIE, WACHENFELD, EASTWOOD, BURLING, WELLS, DILL, FREUND, MCGEEHAN, MCLEAN, JJ. 13.