On September 12th, 1947, the complainant, Ebling Brewing Co., filed a bill of complaint in this court seeking the appointment of a statutory receiver for the defendant corporation, Heirloom, Inc. Such appointment was made by order dated December 9th, 1947.
Complainant operates a brewery in New York and defendant is the sole distributor of complainant's beer and ale in certain designated territory.
The bill alleges that defendant, hereinafter sometimes called "Heirloom" is indebted to complainant, hereinafter sometimes called "Ebling," in the sum of $64,286.03, made up as follows: on open account for beer sold and delivered, $18,857.59; on promissory notes, $35,356.44; and on a so-called "wood account," $10,072. *Page 137 
The bill contains a detailed recital of Heirloom's inability to pay the aforesaid indebtedness, extensions of time for the payment thereof, and subsequent defaults. It also charges that Heirloom is insolvent and unable to meet its matured and maturing obligations; that its business is being conducted at a loss and in a manner highly detrimental to its stockholders and creditors; and that Heirloom's president, Bernard S. Klug, admitted such insolvency and threatened to make the corporation, as well as himself, "judgment proof" if Ebling should take any legal action in the premises.
The bill was fully verified by Saul Rubenfeld, secretary and treasurer of Ebling, and Jack Margolis, who described himself as its sales manager, but who in reality holds that position with Ebling's parent company, the Rubel Corporation. It appears from the affidavits of these men that together they visited Heirloom's office in Jersey City on September 8th, 1947, and spoke to Mr. Klug concerning payment of the indebtedness due Ebling; that Klug admitted his company was unable to pay the obligation; that Heirloom was insolvent and unable to obtain credit because of its poor financial condition; and stated that if Ebling took legal action against Heirloom to recover the amount due he (Klug) would see to it that Ebling would receive nothing and that steps would be taken to protect the assets of Heirloom from being used to satisfy Ebling's claim and that he would make both Heirloom and himself judgment proof.
The allegations of the verified bill satisfied me that the immediate appointment of a custodial receiver was necessary in order to preserve the status quo pending a determination of the matter on the merits. Accordingly, I advised an order on September 19th, 1947, appointing a custodial receiver for Heirloom, which order contained a provision directing that cause be shown on October 6th, 1947, why an injunction should not issue pursuant to the prayers of the bill and a statutory receiver appointed. The order also provided that application to dissolve, enlarge or modify the restraint contained in said order and to vacate the appointment of the custodial receiver could be made on two days' notice. No such application was made on behalf of Heirloom, nor did *Page 138 
its counsel avail himself of the privilege afforded by Chancery rule 215 to examine the affiants Rubenfeld and Margolis. Instead the matter was continued to October 20th, 1947.
Prior to the continued return day of the order, counsel for Heirloom applied to me for an order directing the custodial receiver to put him in funds for the purpose of enabling him to defend the suit. After due consideration of this application I concluded to deny the same and counsel was so informed by letter dated October 15th, 1947. In said letter I also directed that the order appointing the custodial receiver be modified to eliminate therefrom certain language making reference to the duties of a statutory receiver, which language was inadvertently inserted in said order and escaped the court's attention when the same was signed.
On the continued return day of the order to show cause the matter was argued before me. Voluminous affidavits (of which more later) were filed on behalf of Heirloom, as was also a memorandum of law in opposition to the appointment of a receiver. At the conclusion of the argument counsel for Ebling, who had been served with copies of Heirloom's affidavits that morning in court, failed to ask leave of the court to file reply affidavits. However, on the afternoon of that day he telephoned Heirloom's solicitor and sought his consent to file such affidavits, and was refused. He thereupon made formal application, on notice, for leave to file such affidavits, which matter was heard by me on October 27th, 1947. The application was vigorously opposed by Heirloom's solicitor who took the position that the argument on the return day of the order to show cause was tantamount to a final hearing and that in the absence of a claim of surprise, or fraud, or newly discovered evidence, Ebling had no right to file reply affidavits.
With this contention I was not in accord. I felt that Ebling's application was one resting within the sound discretion of the court, and that the failure of counsel to make a formal request for leave to file reply affidavits was purely an oversight which should not prejudice Ebling or preclude the court from ascertaining all of the relevant facts before making a determination on the merits. I accordingly granted *Page 139 
Ebling's application and in due time there was filed with the court reply affidavits on its behalf. These were followed by additional affidavits on behalf of Heirloom, all of which have been considered in arriving at my conclusion that a statutory receiver for Heirloom should be appointed.
At this point I should like to make some observations concerning the affidavits filed on behalf of Heirloom. They contain much matter that is clearly irrelevant and immaterial on the issue involved in this suit. Resort is had to name calling and condemnation of Ebling's products. Serious accusations are made concerning the business practices of Ebling and its president, Samuel Rubel, which, even if well founded, have no place in this proceeding. Indeed, I have no hesitancy in saying that some of the statements made in said affidavits are unworthy of belief. Three of the affiants are former employees of Ebling, who, according to Rubel, were discharged because of unsatisfactory work. See Riehl v. Riehl, 101 N.J. Eq. 15;137 Atl. Rep. 787, headnote 3, wherein it appears: "The Chancellor, as the trier of the facts of a case before him, is the judge of the credibility of the witnesses, and, like a jury, does not have to believe a particular witness; a witness is not entitled to credit whose testimony is inconsistent with the common principles by which the conduct of mankind is naturally governed, and the court may disbelieve a witness whenever there is reason therefor." The principle enunciated in this quotation applies most appropriately to the facts appearing in the instant case.
Brushing aside all irrelevant matter, it appears from the affidavits that Heirloom disputes Ebling's status as a creditor. The claim is made that Ebling is indebted to Heirloom for an amount in excess of that which Heirloom owes Ebling. This excess indebtedness is said to arise by reason of breaches of contract committed by Ebling, and is alleged to run into "hundreds of thousands of dollars."
Counsel for Heirloom takes the position that the Court of Chancery will not appoint a receiver at the behest of a creditor of an alleged insolvent corporation where such creditor's claim is in dispute, for in such a situation the defendant is entitled to a trial by jury, citing Jennings v. Studebaker Corp., 112 *Page 140 N.J. Eq. 591; 165 Atl. Rep. 631. That case does not stand for the proposition as stated by counsel. The claim of the creditor in the cited case was so doubtful that Vice-Chancellor Bigelow felt it should first be established by a judgment at law. Indeed, the nature of the claim was such as to lead the Vice-Chancellor to make the observation that in his opinion the person asserting the claim was not a creditor of the defendant. We have no such situation here. Part of Ebling's claim ($35,356.44) is evidenced by promissory notes made by Heirloom and personally endorsed by its president, Klug.
If the legal proposition, as advanced by Heirloom's counsel, represents a correct exposition of the law, all a defendant would need to do to avoid the appointment of a receiver at the suit of a creditor would be to deny the debt. But this is not the law. A correct statement is that made by Vice-Chancellor Bigelow inJennings v. Studebaker Corp., supra, where he says: "The mere denial of the debt does not oust the court of jurisdiction. The court must consider the proofs and if it clearly appears that the debt exists, the denial will be disregarded. Walser v.Northern Valley Building Corp., 147 Atl. Rep. 494."
We now proceed to a consideration of the claims asserted by Heirloom against Ebling, and the business relations between the parties.
On August 29th, 1945, Ebling and Heirloom entered into an agreement under the terms of which Heirloom was to act as the sole distributor of Ebling's beer and ale in certain designated territory. The agreement specifically reserved to Ebling the right to deliver to Heirloom "so much of our merchandise as we can spare from time to time." The importance of this provision will become apparent in connection with some of the claims asserted by Heirloom. There is no charge that this basic agreement, establishing the business relationship of the parties, was at any time changed, except for a modification which increased the territory allocated to Heirloom.
Business dealings continued under the distributorship agreement until a month or so prior to the filing of the bill of complaint. Klug, in his affidavit, states that during this *Page 141 
period Heirloom purchased from Ebling more than 730,000 cases, more than 20,000 one-half barrels, and more than 4,000 one-quarter barrels, of its beer. It was an accepted practice in the business for the brewery to charge its distributor for the containers, such as bottles and kegs, in addition to the charge made for the beer itself. The distributor in turn would make a similar charge to his customers. Upon the return of the containers to the distributor, he would credit his customer's account with the amount of the charge, and in turn would receive a credit on his account with the brewery upon the return of the empty containers to the brewery. This practice is mentioned because it gives rise to one of the claims made by Heirloom against Ebling.
Business relations were not too harmonious. Disputes arose with respect to the amount of credit to be given Heirloom for empty containers returned to the brewery. Charges of a "short count" appear in the affidavits. Other disputes arose concerning the quality of Ebling's beer and other matters.
As of March 14th, 1947, Heirloom was indebted to Ebling in the sum of $101,356.44. Discussions concerning this indebtedness and claims asserted by Heirloom led to a conference between Klug and Rubel which resulted in a settlement, the scope of which is subject to contradictory statements in the affidavits. Klug says the settlement was effected on March 28th, 1947, in Rubel's office, and that it related solely to spoiled beer, for which his company received a credit of $54,000. This is disputed by the affidavits of Rubel and Sol H. Yellin, Ebling's New York counsel, who say the settlement took place in Rubel's New York office on March 20th, 1947, and that such settlement covered all matters in difference between the parties. I have no hesitancy in accepting this version as the correct one. It is supported by the documentary evidence.
The letter which evidences the settlement is dated March 20th, 1947, and not March 28th, 1947. The terms thereof were agreed to and accepted by Klug on behalf of Heirloom. It specifically refers to the adjustment of all differences existing between the parties and is not limited to a credit for spoiled beer. After setting forth the indebtedness of $101,356.44 *Page 142 
owing on March 14th, 1947, the letter states: "We are granting you an allowance of Fifty-four Thousand ($54,000.00) Dollars in consideration of your waiving any and all claims for beer shipped to you or your designees, and for any and all other claims you may have against our company to the date hereof. None of the spoiled beer will be resold by your company." This last sentence was added by Mr. Yellin in his own handwriting after the letter had been typed, and before it was accepted by Heirloom, in order to prevent Heirloom from selling the spoiled beer at reduced prices.
As part of the settlement, Heirloom agreed to pay the balance of $47,356.44 in the following installments, secured by seven promissory notes bearing the personal endorsement of Klug:
 May 15, 1947 ................... $ 4,000.00
 June 15, 1947 .................. 4,000.00
 July 15, 1947 .................. 4,000.00
 August 15, 1947 ................ 4,000.00
 September 15, 1947 ............. 10,000.00
 October 15, 1947 ............... 10,000.00
 November 15, 1947 .............. 11,356.44
 ___________
 Total ..................... $47,356.44

The notes were duly signed by Klug on behalf of Heirloom, endorsed by him, and delivered to Ebling.
Another provision of the settlement agreement relates to cooperage liability. This referred to Heirloom's liability for barrels or kegs not returned to the brewery. The agreement expressly provided that Heirloom's liability in this respect was in nowise affected by the settlement.
One other instrument was executed at the same time and place in connection with the consummation of the settlement and that was a general release dated March 20th, 1947, running from Heirloom to Ebling. No mention was made of that instrument in any of the answering affidavits filed on behalf of Heirloom. It was brought to the court's attention in the reply affidavits Ebling was permitted to file over the objection of Heirloom's counsel. Klug, in a supplemental affidavit, professed to be profoundly shocked at the appearance *Page 143 
of the release. However, a handwriting expert employed by Klug was of the opinion that Klug's signature to the document was genuine. Klug claims to have no recollection of having seen the release prior to the time it appeared in this suit. His recollection is limited to the signing of the settlement letter of March 20th, 1947, and the seven promissory notes. He claims he never acknowledged the instrument before the notary public who took his oath. He also says that subsequent to March 20th, 1947, he received a letter from Ebling requesting that Heirloom execute a general release. That letter is not produced, Klug stating that he made a caustic notation thereon and returned it to the brewery. I do not believe his story. Mr. Yellin's affidavit explains in detail the circumstances surrounding the execution of the release and states that he (Yellin) introduced Klug to the notary and that Klug signed the release in that officer's presence, who thereupon completed the acknowledgment. I am clearly of the opinion that Klug knew the exact nature of the several instruments signed by him and that there is no factual basis for the charge of fraud in the execution of said instruments.
An analysis will now be made of the claims asserted against Ebling by Heirloom in support of its contention that Ebling is in fact indebted to Heirloom.
 CLAIM FOR PROMOTION AND ADVERTISING CHARGES.
In support of this claim Klug alleges that in December, 1945, Rubel approached him and Hans Busch, who was then president of Heirloom, to discuss ways and means of promoting the sale of Ebling's beer. This discussion is said to have resulted in a verbal agreement (apparently indefinite as to time) under the terms of which Ebling agreed to pay Heirloom certain moneys, based on the quantity of merchandise purchased by Heirloom from Ebling, on account of Heirloom's advertising and promotion expenses. Heirloom claims that with respect to sales made during the months of January and February, 1946, Ebling paid Heirloom the agreed sum on account of its advertising and promotional expenses, but that commencing in March, 1946, Ebling ceased to do so. The *Page 144 
breach of this contract, according to Heirloom, entitled it to damages amounting to $41,986.04.
Rubel frankly admits the making of such an agreement but says it was Klug who suggested that if Heirloom could get from Ebling an allowance for promotional expense and advertising, he would be able to stimulate the sale of Ebling's beer during that season of the year when business was slow. It was thereupon agreed that Heirloom would receive an allowance of 6 1/2c per case on all cases of beer purchased from Ebling during the months of January and February, 1946, and for no other period. In accordance with this agreement Ebling paid Heirloom $7,211.16 which covered all purchases made during the months of January and February. This payment was made by two checks, one dated February 7th, 1946, for $4,361.39, and the other dated April 3d 1946, for $2,489.86.
I have grave doubts concerning the validity of this claim. Heirloom has failed to produce any letter or other writing making any reference to this claim or a demand for moneys due on merchandise, purchased in the months subsequent to February, 1946. There is also a serious question as to whether or not such a contract, assuming its terms to be as stated by Klug, would be legally enforceable. It seems strange that Klug, who wrote a number of letters to Ebling complaining about "short counts" on the return of empty containers, would not, in the same manner, make the claim he is now asserting. Klug has annexed to one of his affidavits five copies of what he calls "selected letters" to Ebling. It is significant to note that all of them deal with but one subject, namely, the credit to be given on returned containers. Another very significant fact to take into consideration in evaluating this claim is that those promissory notes executed in connection with the settlement made on March 20th, 1947, and which became due on May 15th, 1947, June 15th, 1947, and July 15th, 1947, which notes totaled $12,000, were paid. If Heirloom had coming to it from Ebling the sum of $41,986.04 which, according to Klug's version of the transaction, must have accrued prior to the time the promissory notes were paid, why was not an attempt made to offset the notes against the claim? My *Page 145 
observations with respect to this claim have not taken into consideration the general release executed by Heirloom on March 20th, 1947. Assuming the existence of such a claim, the release would prove a legal barrier to its assertion at this time.
CLAIM FOR BREACH OF AGREEMENT TO DELIVER THREE TIMES THE QUANTITIES OF BEER FOR THE SUMMER MONTHS OF 1946 OVER HEIRLOOM'S AVERAGE PURCHASES DURING THE MONTHS OF DECEMBER, 1945, AND JANUARY, 1946.
At the same time that the promotion and advertising contract was made in December, 1945, another verbal agreement is alleged to have been made between the parties. Klug states that Rubel agreed Ebling would sell and deliver to Heirloom three times as much beer during each of the summer months of 1946, as Heirloom had purchased during December, 1945, and January, 1946. It is claimed that Ebling failed to keep this promise and that this failure resulted in a total loss of profit to Heirloom of $266,250.
The claim in my opinion is preposterous and unworthy of belief. The same observations made with respect to the advertising and promotional expense claim apply here also. There is a flat denial of the claim on the part of Ebling. Attention is called to the distributorship agreement between the parties dated August 29th, 1945, which provides that Ebling will deliver to Heirloom only so much of its merchandise as it can spare from time to time.
 CLAIM FOR BAD BEER RETURNED.
Under this head Heirloom claims to be entitled to a credit of $18,252.88. It is not stated when this bad beer was returned. The records of Ebling, according to its secretary and treasurer, show that no beer shipped to Heirloom subsequent to March 20th, 1947, was ever returned. It clearly appears that this item was embraced within the $54,000 credit which was given to Heirloom by Ebling in connection with the settlement *Page 146 
effected on March 20th, 1947. Moreover, annexed to Rubel's affidavit is a copy of a letter dated March 19th, 1947, written by Klug to Ebling which refers to the return, on March 18th, 1947, of one truckload of bad barrel beer and that in accordance with the understanding of the parties the load would be checked in for "cooperage credit only," which means that the only credit to which Heirloom was entitled was that due for the return of the barrels as empty containers. Here again we have a claim for which there appears to be no foundation. The documentary evidence is to the contrary.
CLAIM FOR DAMAGES FOR $50,000 FOR BREACH OF CONTRACT TO DELIVER QUANTITIES OF CANNED BEER IN CONSIDERATION OF HEIRLOOM'S ASSUMPTION OF CLAIM OF SMITH WILSON.
This claim is based on a sale of Ebling's beer made by Heirloom to one of its customers in West Virginia, Smith Wilson. This beer, in keeping with West Virginia law, was to have an alcoholic content of not more than 3.2%. A complaint was made that the alcoholic content of this beer was in excess of 3.2%, and also that it was spoiled and sour. At the time of this occurrence beer in cans was scarce and Klug alleges that Rubel approached him and said that if Heirloom would "take care" of the West Virginia claim, Ebling would give Heirloom unlimited quantities of cases of cans of beer, and that it was in reliance on this promise that Klug, on behalf of Heirloom, signed the indemnification agreement, an unsigned and undated photostatic copy of which he annexed to his affidavit. Heirloom claims that Ebling's failure to live up to this promise has damaged it to the extent of $50,000.
Rubel denies making any promise to Klug to give Heirloom unlimited quantities of canned beer. Again we have the case of an alleged verbal agreement with no writing of any kind making any reference thereto. The distributorship agreement (letter of August 29th, 1945) does not help Heirloom. The attempt to spell out an independent agreement based on Heirloom's assumption of the Smith Wilson claim likewise fails *Page 147 
because it appears that all beer sold to Smith Wilson was shipped to that concern between January 14th, 1946, and December, 1946. Consequently, the claim of Smith Wilson for spoiled beer was clearly embraced within the terms of the settlement effected between Ebling and Heirloom on March 20th, 1947.
The indemnification agreement and the details surrounding its execution are fully set forth in the Ebling affidavits. It was Heirloom's failure to adjust the Smith Wilson claim after Heirloom had received the $54,000 credit from Ebling that led to the request for an indemnification agreement, which agreement was signed on July 9th, 1947, and appears as an exhibit to the Yellin affidavit of November 5th, 1947. I am satisfied that Klug executed the indemnification agreement on behalf of Heirloom because he recognized it was the obligation of his company to do so, and not in reliance on Rubel's promise to give Heirloom unlimited quantities of canned beer.
 CLAIM FOR OVERCHARGES IN VIOLATION OF O.P.A. RULES AND REGULATIONS.
This claim is illustrative of the extreme which can be reached when rancor and intense feeling are injected into a law suit. Klug alleges he recently learned that Ebling had overcharged Heirloom six cents a case as a loading charge on each case of beer it purchased from Ebling, which overcharge was in violation of the rules and regulations of the Office of Price Administration and resulted in Ebling paying a "substantial fine" to the United States. It is baldly stated that this gives rise to a claim in favor of Heirloom and against Ebling for $46,934.98.
The explanation made by Ebling's New York counsel is that the Office of Price Administration commenced a civil suit against Ebling which involved the legality and retroactive effect of an amendment of an O.P.A. regulation upon a price which had previously been legally authorized by that agency to Ebling. The litigation was settled and the question of a loading charge was not at all involved. Even if we assume that Heirloom at one time could have maintained a cause of *Page 148 
action against Ebling by reason of the alleged overcharge, the fact is that the claim is no longer legally enforceable and has long since been outlawed.
In addition to the foregoing, Heirloom also claims damages running into "hundreds of thousands of dollars" arising out of Ebling's continual sales to Heirloom of spoiled, unfit and misbranded beer, which has resulted in Heirloom's loss of customers and profits.
It is difficult for me to believe that the claims now being asserted against Ebling had any real existence prior to the institution of this suit. The court is being asked to shut its eyes to the realities of the situation. With all these claims outstanding Heirloom nevertheless continued to transact business with Ebling on a large scale. No letters or writings of any kind are produced, except letters relating to credit for the return of empty containers, which in any way refer to such claims or their assertion against Ebling prior to the filing of the bill. Klug claims that during May, June and July, 1947, he continually complained to Rubel concerning Ebling's alleged wrongful conduct and yet we find that the promissory notes payable on the 15th day of each of those very months were paid when due.
The note payable on August 15th, 1947, was not paid when due. On that day Klug sent a check to Ebling to cover the note with the request that it be held until the end of that month. When the check was deposited on August 29th, 1947, Ebling was advised by the bank that payment thereon had been stopped. Klug's story is that payment was stopped because at that time Heirloom was ready to institute suit against Ebling. If he was then ready to institute suit why did he find it necessary to give Heirloom's check in payment of the note? Moreover, the bill of complaint in this cause was not filed until September 19th, 1947, and up to that time Heirloom had taken no legal action against Ebling.
The affidavit of Sol L. Kesselman, the registered agent and attorney for Heirloom, seeks to substantiate Klug's story that legal action against Ebling was contemplated. That affidavit fixes the time as the early part of September, 1947, and does not square with Klug's story as to the reason why the promissory note payable on August 15th, 1947, was not paid when *Page 149 
due. Moreover, Kesselman's affidavit states that he was in communication with Ebling's New York lawyer on September 25th, 1947, at which time he told him that unless the matter was adjusted Heirloom would institute suit, and that the next thing he heard was that a bill for the appointment of a receiver had been filed. As heretofore stated, the bill was filed on September 19th, 1947, and I am satisfied that Kesselman, as the registered agent of Heirloom, was served with copies of the bill of complaint and order appointing the custodial receiver prior to that date. As a matter of fact Klug was personally served with copies of these papers on September 19th, 1947, and I cannot believe he did not immediately communicate that fact to Kesselman.
Klug admits that Margolis and Rubenfeld visited him at his office in Jersey City on September 8th, 1947. At this time the promissory note due August 15th, 1947, was in default and payment had been stopped on the check given in payment thereof. Yet notwithstanding this situation Klug claims that "there was no conversation of any sort at that time or any other time, with respect to any indebtedness of defendant to complainant." Is the court to assume that this was a social call? If, as claimed by Klug, nothing was said concerning the indebtedness, I believe it was incumbent upon him to inform the court just what was said on this important occasion. The affidavit is silent on this score.
On August 15th, 1947, when the promissory note for $4,000 became due, Klug claims that there was in Ebling's possession more than $5,000 worth of "empties" for which Ebling refused to credit Heirloom. Why, if this were so, did Heirloom give its check for $4,000 to take up said note?
There also appears in the Klug affidavit a statement that Heirloom presently has in its possession and in the possession of its customers approximately $115,000 worth of "empties," most of which it could return for credit if Ebling would accept the same. I am satisfied that Ebling has always been ready and willing to accept the return of "empties" and to credit Heirloom therefor. It would appear from Rubenfeld's affidavit that returns were made and accepted until shortly prior to the filing of the bill of complaint. Ebling states that it will accept all "empties" returned by Heirloom and give *Page 150 
proper credit therefor. However, the rub lies in the fact that the "empties" are not all in the possession of Heirloom. The bulk of them are in the possession of Heirloom's customers and if and when they are returned to Heirloom it will be necessary for Heirloom to credit the accounts of its customers for such returns. Then, and only then, will it be in a position to send them on to Ebling for credit.
No useful purpose will be served by commenting on other provisions of the Heirloom affidavits. As heretofore indicated much of the matter is clearly irrelevant and immaterial, to characterize it mildly. The issue involved is the solvency or insolvency of Heirloom. I am satisfied that Ebling has a proper status as a creditor and that the claims asserted by Heirloom are of such doubtful validity that this court must ignore them in its consideration of the matter.
In support of its contention that Heirloom is solvent there is annexed to the affidavit of Herman Siegel, a certified public accountant and the secretary-treasurer of Heirloom, a statement of assets and liabilities (but no operating statement) of Heirloom as of September 19th, 1947. That shows current assets of $83,629.37. Of this total, cash on hand and in bank amounts to only $181.71. It is not difficult, in view of this cash position, to understand why a request was made to extend the due date of the promissory note due August 15th, 1947, and why the note due September 15th, 1947, was not paid. Accounts receivable are listed at $54,454.76. Whether these accounts are current, slow or doubtful is not made to appear. In any event they should be reduced by $10,252.90, representing credit balances listed under current liabilities. The merchandise inventory is listed at $8,900. What this consists of is not stated. Also listed among the current assets is stock of the Heidelberg Brewing Co., Inc., in the amount of $16,641.40. The number of shares is not shown, nor the price per share. Since that stock is held by the Fidelity Union Trust Company as collateral security for a loan of $3,500, it should be eliminated as a current asset of Heirloom.
The liabilities of Ebling are listed in the total sum of $50,731.84. The proofs satisfy me that the correct amount is $64,286.03, subject to such credit as Heirloom might be entitled to upon the return of "empties." The amount due *Page 151 
Ebling is said to be subject to an allowance of $41,986.04 for advertising and sales promotion, and $18,252.88 for beer returned to the brewery. I have already stated my views on the validity of these items. It is significant to note that the balance sheet makes no mention of the various other claims asserted in the Heirloom affidavits.
It is also noted that no reference is made in the balance sheet to other claims against Heirloom. On December 15th, 1947, there was filed in this cause a verified petition by Wayne E. Kimball, doing business as Stark Distributing Co. to intervene as a party complainant. The petitioner claimed to be a creditor of Heirloom for a considerable sum of money, in excess of $70,000. An examination of the verified petition satisfied me that the petitioner was in fact a creditor of Heirloom, at least to the extent of some of the items listed in the petition, and that a proper balance sheet should have included the claims of this creditor among the liabilities of Heirloom, subject to such adjustments as might be called for by the exigencies of the situation. And the mere fact that this petition was subsequently withdrawn does not alter my view on the subject.
Another petition to intervene was filed by the Lehigh Valley Railroad Company. It claimed to be a creditor of Heirloom to the extent of several thousand dollars for unpaid freight charges and unpaid car demurrage charges. While it is true that this petition, which was filed by the same solicitors who filed the Kimball petition, was also withdrawn, an affidavit made by Klug in connection with this application to intervene, admitted that Heirloom owed the Lehigh Valley Railroad the sum of $2,171.60, but denied that Heirloom was indebted for the balance of the claim asserted. It seems to me that this admitted liability should also have been reflected on the balance sheet.
Siegel, Heirloom's accountant and secretary-treasurer, in his affidavit states that Heirloom operates on a fiscal year basis ending June 30th; that the company's tax return for the fiscal year ending June 30th, 1947, was not filed because Heirloom obtained an extension of time to November 15th, 1947; and that consequently the profit for the year ending June 30th, 1947, could not be stated with exactitude. He *Page 152 
then proceeds to give approximate figures which, he says, are subject to adjustments which have to be made. Losses subsequent to October 31st, 1946, are admitted, but Heirloom claims that these were due entirely to the spoiled quality of the beer it purchased from Ebling.
Mention is made in the same affidavit that Heirloom, in November, 1946, had completed arrangements with its bank for a $50,000 line of credit. However, it clearly appears that this was to be a secured line, the money to be loaned against sight drafts, bills of lading attached, on shipments made to customers. Whether or not Heirloom ever availed itself of this line of credit is not stated.
It is rather singular that the item of "Loans Payable" appearing on the balance sheet represents a loan of $9,500 made by Siegel to Heirloom. A company enjoying adequate bank credit would hardly find it necessary to borrow money from one of its officers.
An effort is also made in the Heirloom affidavits to show an expansion of its business and its acquisition of other quarters. The fact of the matter is, however, that Heirloom presently occupies premises owned by Ebling's parent company, the Rubel Corporation, and that Heirloom was requested to move from said premises because the owner required them for its own purpose. It thus appears that the move contemplated by Heirloom was one of necessity, precipitated by the landlord's removal notice.
Upon a consideration of the whole case I am satisfied that Heirloom was and is insolvent within the meaning of our Corporation Act, and that a receiver should be appointed therefor. An analysis of the balance sheet (after making such adjustments as are herein indicated) shows an unhealthy ratio of current assets to current liabilities. There appears to be a lack of working capital which would make it almost impossible for Heirloom to continue to conduct its business in a normal manner.
The nebulous and fantastic claims asserted by Heirloom against Ebling do not bolster Heirloom's financial condition. There is no quarrel with the cases cited in the memorandum submitted by Heirloom's solicitor in opposition to the appointment of a receiver. This court will not appoint a receiver *Page 153 
unless the proof of insolvency is clear and satisfactory and there is no reasonable prospect that the corporation, if let alone, will be able to carry on with safety to the public and advantage to its stockholders. Hoagland v. United States TrustCo., 110 N.J. Eq. 489; 160 Atl. Rep. 662. However, the proofs in this case satisfy me that there is a general inability on the part of Heirloom to meet its pecuniary liabilities as they mature by available assets or honest use of credit, and that there is no reasonable prospect that Heirloom, if left alone, will be able to carry on with safety to the public and advantage to its stockholders and creditors. Fort Wayne Electric Corp. v.Franklin Electric Light Co., 57 N.J. Eq. 7; 41 Atl. Rep. 217;
affirmed, 58 N.J. Eq. 579; 43 Atl. Rep. 1098; Catlin v.Vichachi Mining Co., 73 N.J. Eq. 286; 67 Atl. Rep. 194; Walser
v. Northern Valley Building Corp., 147 Atl. Rep. 494, a Court of Errors and Appeals decision not reported in the state reports.
The proofs clearly show that complainant has made out a case under the provisions of R.S. 14:14-3, and I believe that Klug, notwithstanding his subsequent denial, did make the statements attributed to him by Rubenfeld and Margolis on the occasion of their visit to Klug's office on September 8th, 1947, and that the obligations due Ebling could not be met by Heirloom for the reason then stated by Klug, namely, the company's insolvency.
My views concerning the weight to be attributed to the defendant's affidavits, are indicated by my observation in the case of Mullins v. Merchandise, c., Union No. 641, 120 N.J. Eq. 376; 185 Atl. Rep. 485, where I said: "The defendants' answering affidavits clearly indicate that they were drawn with a view to falling within the third rule of the Citizens' Coach Co.Case. However, there are several instances where the courts have indicated that if circumstances warrant, they will not obstinately and steadfastly adhere to the third rule, if sound judgment calls for a preliminary injunction despite the existence of answering affidavits. The courts are not persuaded so much by the formality of the filing of answering affidavits as they are by their substance. They do not always deny the issuance of a preliminary injunction where the bill and the affidavits are met by a denial." *Page 154